# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

| | | |
|---|---|---|
| Northern Berks Regional | : | |
| Police Commission | : | |
| | : | |
| v. | : | No. 254 C.D. 2018 |
| | : | Argued: September 14, 2018 |
| Berks County Fraternal Order | : | |
| of Police, Lodge #71, | : | |
| Appellant | : | |

BEFORE:   HONORABLE P. KEVIN BROBSON, Judge
HONORABLE ANNE E. COVEY, Judge
HONORABLE DAN PELLEGRINI, Senior Judge (P.)

OPINION BY JUDGE BROBSON          FILED:  October 31, 2018

Berks County Fraternal Order of Police, Lodge #71 (FOP) appeals from an order of the Court of Common Pleas of Berks County (trial court), which vacated an arbitration award (award) ordering the reinstatement of Charles Hobart (Hobart) to his position of municipal police officer with the Northern Berks Regional Police Department (Department).  For the reasons discussed below, we vacate the trial court's order and remand the matter to the trial court.

## I.   BACKGROUND

The Northern Berks Regional Police Commission (Commission) provides police services to certain parts of Berks County.  The Commission is a party to a collective bargaining agreement (CBA) with the FOP.  Hobart worked as a police officer for the Commission and was a member of the bargaining unit

represented by the FOP. While employed by the Commission, Hobart worked at the Department, which is comprised of fourteen officers.

In September 2016, the Commission terminated Hobart's employment due to misconduct. Specifically, the Department learned that Hobart kept a file folder in his desk containing (1) explicit pictures of females in different stages of undress, (2) photographs printed from a police information system, and (3) directions printed from MapQuest. In investigating the matter, the Commission discovered that Hobart used these pictures for personal sexual gratification. Further, the Commission discovered that Hobart exceeded his authorization of official-use operating systems. These operating systems included the Pennsylvania Justice Network[1] (JNET) and the Commonwealth Law Enforcement Assistance Network[2] (CLEAN). Because of these violations, Hobart's access to JNET, CLEAN, and an information system maintained by the Pennsylvania Department of Transportation (PennDOT) was permanently revoked.

The FOP filed a grievance on Hobart's behalf, arguing that the Commission did not have just cause to terminate his employment. The grievance was denied. The matter then proceeded to binding arbitration under what is referred

---

[1] JNET is the Commonwealth's primary public safety and criminal justice computer information system. It provides an online environment for authorized users to access public safety and criminal justice information. (Reproduced Record (R.R.) at 563a.)

[2] CLEAN is used by the Commonwealth's criminal justice agencies to access driver's license and motor vehicle information, state criminal history record information, the Commonwealth's central registry for protection from abuse orders, law enforcement messaging capabilities, and a host of other services. (*Id.* at 565a.)

to as Act 111.[3]  The issue before the arbitrator was whether the Commission had just cause to remove Hobart and, if it did not, what was the remedy.

Following a hearing, the arbitrator issued his decision and award, in which he concluded that the Commission did not have just cause to terminate Hobart's employment.  The award detailed the testimony of then-Chief of Police Scott Eaken (Chief Eaken), who testified to the circumstances surrounding Hobart's termination.  According to the award, Chief Eaken testified that the contents within Hobart's file folder could be divided into three categories:  (1) JNET violations; (2)  MapQuest inquiries; and (3) pictures of women in different stages of undress. (R.R. at 568a.)  With respect to the JNET violations, Chief Eaken testified that Hobart used JNET to search and print out driver's license photographs of women. (*Id.* at 569a.)  Chief Eaken conceded that, if not for the JNET violations, the Department probably would not have terminated Hobart's employment.  (*Id.*) Further, the award noted that Chief Eaken compared Hobart's actions to that of another officer who received punishment for exceeding his JNET access.  In the previous situation, the officer improperly used JNET over a three-year period to access thousands of records unrelated to official police business. (*Id.* at 571a.)  That officer received a four-day suspension. (*Id.*)  The arbitrator determined that Hobart's discipline appeared disproportional when compared to that of the other officer. (*Id.* at 566a.)  Further, the arbitrator concluded that, although the record did not support a penalty of terminating Hobart's employment, his conduct nonetheless

---

[3] Act of June 24, 1968, P.L. 237, *as amended*, 43 P.S. §§ 217.1-.10.  Act 111 pertains to the rights of police officers to bargain collectively with their public employers regarding the terms and conditions of the employment, including pensions and other benefits, and, if they fail to reach an agreement, to proceed to arbitration for resolution. *Northampton Twp. v. Northampton Twp. Police Benevolent Ass'n*, 885 A.2d 81, 82 n.1 (Pa. Cmwlth. 2005), *appeal denied*, 902 A.2d 1243 (Pa. 2006).

merited a severe punishment. (*Id.* at 576a.) As such, the arbitrator converted the termination into an unpaid suspension with time served and ordered Hobart's reinstatement. (*Id.*)

The Commission filed a petition with the trial court, seeking to vacate the award. The Commission asserted that the arbitrator exceeded his powers in ordering Hobart's reinstatement, as restoring Hobart to his position would compel the Commission to violate the law. Specifically, the Commission averred that a police officer's duties require that the officer have access to CLEAN and JNET. As Hobart's access to these systems had been permanently revoked—a revocation which the Commission cannot override—restoring Hobart to his position would expose him to information that he is not authorized to access in violation of laws prohibiting unauthorized access. The trial court issued a rule, directing the FOP to show cause why the Commission is not entitled to the relief requested. The FOP responded, essentially denying the Commission's assertions.

The trial court held an evidentiary hearing, at which it received testimony regarding the revocation of Hobart's access to CLEAN, JNET, and the PennDOT system. Further, the trial court received testimony regarding how Hobart's reinstatement would compel the Commission to violate the law. As its first witness, the Commission called the Department's patrol sergeant and head of criminal investigations, Robert Wood, Jr. (Sergeant Wood). (*Id.* at 372a.) Sergeant Wood testified that using JNET and other information systems is critical to an officer's core function, and he provided examples of how an officer uses these systems throughout the course of a day. (*Id.* at 401a-16a.) Sergeant Wood further testified that a police officer would be unable to perform many routine tasks without access to these systems. (*Id.* at 417a.)

4

On cross-examination, Sergeant Wood testified that, in order to become a municipal police officer in the Commonwealth of Pennsylvania, an individual must receive certification through the Municipal Police Officers' Education and Training Commission (MPOETC). (*Id.* at 427a.) To that point, Sergeant Wood conceded that access to JNET, CLEAN, or PennDOT's system is not required for certification as a municipal police officer. (*Id.* at 430a.)

Next, the Commission called the Department's Chief of Police, Brian Horner (Chief Horner). (*Id.* at 448a.) Chief Horner testified that, after the award ordered Hobart's reinstatement, Chief Horner forwarded letters to JNET, CLEAN, and PennDOT to appeal the revocation of Hobart's access. These appeals were denied. (*Id.* at 450a.) Chief Horner asserted that Hobart is unable to perform his duties for the Department without access to JNET, CLEAN, and PennDOT's system, as officers' duties regularly necessitate their use. (*Id.* at 457a, 462a.) Although Chief Horner agreed that certification through MPOETC is all that is required to perform duties as a municipal police officer, he rejected the notion that Hobart would be able to work at the Department in a capacity that did not involve using JNET, CLEAN, or PennDOT's system. (*Id.* at 459a.) Chief Horner attributed this to the small size of the Department, stating:

> With our department, you have to have PennDOT, JNET, and CLEAN access. You have to do all full duties of a police officer in order to work for [the Department]. We are a smaller department compared to big cities. We don't have any true specialized fields other than, like, a criminal investigator's position, detective's position.
>
> So you still have to have all of the PennDOT, JNET, and CLEAN access in order to work at [the Department]. If any of the officers would not have PennDOT, JNET, or CLEAN [access], they would not be working for our police department.

(*Id.*) Chief Horner went on to testify that Hobart is not permitted in the Department's barracks because he would be exposed to criminal and PennDOT records. (*Id.* at 460a.) Although Chief Horner asserted that the Department does not allow individuals within its facility who do not have access to JNET or CLEAN, he conceded that there is no written policy regarding such circumstances. (*Id.*)

On cross-examination, Chief Horner agreed that it is lawful for an individual with MPOETC certification to work as a municipal police officer without access to JNET, CLEAN, or PennDOT's system. (*Id.* at 463a.) Chief Horner went on to opine that the Department would violate the law if Hobart returned to work at the Department. (*Id.* at 467a-68a.) Again, Chief Horner attributed this to the small size of the Department. (*Id.* at 468a.)

Next, the Commission called PennDOT's Director of Risk Management, Brent Lawson (Lawson). (*Id.* at 475a.) Lawson testified that his group is responsible for, *inter alia*, auditing access to PennDOT data. (*Id.* at 476a.) Lawson testified that PennDOT would reverse its decision to revoke someone's access permanently only if it learned that the data misuses were attributable to legitimate government functions or legitimate law enforcement reasons. (*Id.* at 480a.) On cross-examination, Lawson conceded that he was not aware of any law that prohibited Hobart from being a municipal police officer. (*Id.* at 485a.)

The Commission then called Joseph R. McCunney (Corporal McCunney), a corporal with the Department and the audit investigation unit supervisor of the CLEAN administrative unit. (*Id.* at 489a.) Corporal McCunney testified that the revocation of Hobart's CLEAN access means that he cannot have direct or indirect access to secure areas where information is stored, such as police departments. (*Id.* at 494a-95a.) Further, Corporal McCunney testified that Hobart

6

is unable to sit in a police vehicle that has a computer due to the potential exposure to unauthorized information. (*Id.* at 497a.) On cross-examination, Corporal McCunney conceded that CLEAN access is not required for MPOETC certification. (*Id.* at 499a.)

Next, the Commission entered into evidence the deposition testimony of Eric Webb (Webb), Executive Director of JNET. (*Id.* at 184a.) Webb testified that a police department cannot compel JNET to reverse a revocation of a police officer's access. (*Id.* at 214a.) Further, even if JNET were to lift a ban on an officer's access, JNET has no control over whether PennDOT or CLEAN would do the same. (*Id.* at 215a.) With respect to the appeal Chief Horner forwarded to JNET, Webb testified that he informed Chief Horner that, in order to be meritorious, there would have to be a substantial change in the facts of the misuse investigation or any circumstances of the misuse that had been clarified or changed since the initial investigation. (*Id.* at 217a.) Without such a change, Webb testified that there would be no reason for an appeal. (*Id.*) Over an objection, Webb testified that he did not see any possibility that Hobart's appeal would result in JNET reinstating Hobart's access. (*Id.* at 217a-18a.)

The FOP called Hobart as its only witness. Hobart testified that he has a valid MPOETC certification that permits him to work as a municipal police officer. (*Id.* at 506a.) Although Hobart testified that he could still perform certain duties as a police officer without access to JNET, CLEAN, or PennDOT's system, he conceded that the performance of his duties would require other officers' involvement due to his lack of access. (*Id.* at 506a, 512a.)

Following the hearing, the trial court issued a decision, vacating the award. (*Id.* at 693a-701a.) In so doing, the trial court concluded that the arbitrator

7

exceeded his powers by ordering the Commission to do something it could not voluntarily do—*i.e.*, violate laws relating to unauthorized access to protected information. (*Id.* at 699a-700a.) Specifically, the trial court concluded that returning Hobart to his position would expose Hobart to JNET and CLEAN records, which are protected from unauthorized disclosure pursuant to 18 U.S.C. § 1030, relating to fraud and related activity with computers. (*Id.* at 700a.) Further, the trial court concluded that Hobart's reinstatement could cause the Department to violate 18 Pa. C.S. § 7611(a), which criminalizes the unlawful use of a computer when a person exceeds his authority to access a computer database. (*Id.*) With respect to the FOP's assertion that MPOETC certification is all that is required to work as a police officer, the trial court opined:

> [FOP] argues that all Mr. Hobart needs is [MPOETC certification]. In order to perform the duties of a police officer, an officer must have more than the [MPOETC] certification. This certification represents the minimum requirements. It is analogous to a lawyer receiving a juris doctorate [sic] after graduating from law school; however, in order to practice law, the graduate also needs to pass the state bar examination and be licensed to practice law in the Commonwealth of Pennsylvania. Mr. Hobart may have passed his certification training, but he cannot access any information required for the performance of his job. Thus, he cannot be a police officer in the [Department].

(*Id.* at 701a.) Further, with respect to the FOP's assertion that Hobart could maintain his employment in a capacity without access to JNET, CLEAN, and PennDOT's system, the trial court opined:

> There is a myriad of laws that [the Commission] would potentially break in retaining Mr. Hobart as a police officer. [The FOP] suggests that accommodations could be made for Mr. Hobart that would circumvent these laws and Mr. Hobart's lack of privileges to the databases. This

8

argument is ridiculous. It is not possible for Mr. Hobart to continue working in a police department composed of fourteen officers.

The only way [the Commission] could have Mr. Hobart as a police officer is by providing him with a special room with no computer access to JNET. [The Commission] would then have to pay Mr. Hobart a police officer's salary for not performing his work and another officer for doing his own job and completing Mr. Hobart's work. This scenario would be a farce. Both [the Commission] and its citizens would be inconvenienced and overtaxed.

(*Id.*) The FOP subsequently filed the instant appeal.

## II. ISSUES ON APPEAL

On appeal, the FOP advances four claims of error by the trial court. First, the FOP argues that the trial court erred in concluding that the arbitrator exceeded his powers by ordering the Commission to do something that it could not voluntarily do. Second, the FOP argues that the trial court erred by exceeding its narrow scope of review by considering matters such as the convenience to the Commission, the financial impact on the Department and its taxpayers, and the underlying facts of the arbitration. Third, the FOP argues that the trial court erred by basing its decision on an incorrect factual finding. Fourth, the FOP argues that the trial court erred by substituting its judgment for that of the arbitrator.

It is well-settled that a judicial review of a grievance arbitration award arising under Act 111 is in the nature of narrow certiorari. *Town of McCandless v. McCandless Police Officers Ass'n*, 901 A.2d 991, 996 (Pa. 2006). "[T]he narrow certiorari scope of review limits courts to reviewing questions concerning: (1) the jurisdiction of the arbitrators; (2) the regularity of the proceedings; (3) an excess of the arbitrator's powers; and (4) deprivation of constitutional rights." *Pa. State Police v. Pa. State Trooper's Ass'n (Betancourt)*, 656 A.2d 83, 89-90 (Pa. 1995). "An

9

arbitrator's powers are limited. He or she may not mandate that an illegal act be carried out; he or she may only require a public employer to do that which the employer can do voluntarily." *Id.* at 90 (citing *City of Washington v. Police Dep't of City of Washington*, 259 A.2d 437, 442 (Pa. 1969)). An arbitrator's award "must encompass only terms and conditions of employment and may not address issues outside of that realm." *Id.* Further, a mere error of law would be insufficient to support a court's decision to reverse an Act 111 arbitrator's award. *Id.*

## III. DISCUSSION

### A. Illegality of Award

We begin by addressing the FOP's argument that the trial court erred by concluding that returning Hobart to work would compel the Commission to perform an illegal act. The FOP argues that because MPOETC certification is all that is required to serve as a municipal police officer, Hobart can still perform police functions without access to JNET, CLEAN, and PennDOT's system. Given that Hobart possesses MPOETC certification, the FOP maintains that reinstating him does not compel the Commission to perform an illegal act.

In response, the Commission argues that, although MPOETC certification permits Hobart to work as a municipal police officer, the award still compels the Commission to violate the law. Specifically, the Commission argues that it is impossible for Hobart to work in the Department in a capacity that avoids direct or indirect exposure to information he cannot access. As such, if the Commission were to reinstate Hobart, it would be forced to violate numerous state and federal laws related to unauthorized access of information.[4]

---

[4] The Commission maintains that reinstating Hobart would compel the Commission to potentially violate the following: (1) 18 U.S.C. § 1030, which prohibits unauthorized access to

10

The issue before us is relatively straightforward, that being whether the award compels the Commission to commit an illegal act. If the award does not compel the Commission to do so, then we must conclude that the trial court erred in holding that the arbitrator exceeded his power. As this Court opined in *City of Scranton v. E. B. Jermyn Lodge No. 2 of Fraternal Order of Police*, 903 A.2d 129 (Pa. Cmwlth. 2006), *appeal denied*, 919 A.2d 959 (Pa. 2007):

> [W]hat is in excess of the arbitrator's powers . . . *is not whether the decision is unwise, manifestly unreasonable, burdens the taxpayer, is against public policy* or is an error of law; an arbitrator only exceeds his power if he *mandates that an illegal act be carried out* or requires a public employer to do that which the employer could not do voluntarily.

*City of Scranton*, 903 A.2d at 135 (emphasis added).

Here, in vacating the award, the trial court concluded that "[t]here is a myriad of laws [the Commission] would potentially break" by reinstating Hobart. (R.R. at 701a.) The trial court found that the small size of the Department effectively prevented Hobart from being able to perform his duties without access to JNET, CLEAN, and PennDOT's system. To that point, the trial court opined:

> Department is a small police department. The whole department is a secured area for JNET access. Most importantly, Department would violate laws by allowing Mr. Hobart into the facility unaccompanied. There are only two officers on a shift. Department cannot have half of a shift not fully completing its police duties. Nor can the Department afford to require the other member of the shift to provide continuous monitoring of Mr. Hobart to

protected information via computer; (2) 18 Pa. C.S. § 7611(a), which is essentially the state law equivalent of 18 U.S.C. § 1030; (3) 75 Pa. C.S. § 6114, which prohibits the unauthorized disclosure of driving records; (4) 18 U.S.C. §§ 2511, 2701, which prohibit disclosure of electronic communications; (5) the Wiretapping and Electronic Surveillance Control Act, 18 Pa. C.S. §§ 5701-5782, which is essentially the state law equivalent of 18 U.S.C. §§ 2511, 2701; and (6) 18 U.S.C. §§ 2721-2722, which prohibit the disclosure of state motor vehicle records.

11

> prevent him from receiving data to which he is not entitled. If Mr. Hobart violates the access prohibitions imposed, it could lead to suspension of Department's JNET privileges or, worse, Department's violation of federal and state criminal statutes.

(*Id.* at 699a-700a.) While the FOP is correct in asserting that a valid MPOETC certification permits an individual to work as a municipal police officer, it does not lend support to a conclusion that the trial court erred. The award did not reinstate Hobart to a generalized police officer position. Rather, the award reinstated Hobart to a police officer position *within the Department*. According to the unrebutted testimony of Chief Horner and Sergeant Wood, the Department's structure and makeup demand that all of its police officers have access to JNET, CLEAN, and PennDOT's system, because officers for the Department use them on a near-daily basis. (*Id.* at 401a-16a, 459a.) It is undisputed that, at present, Hobart cannot lawfully, directly or indirectly, have access to those systems. *See, e.g.*, 75 Pa. C.S. § 6114; 18 U.S.C. § 2721. Hobart, therefore, is currently unable to perform the duties of the position to which the award reinstated him without placing himself and the Department in a position to violate these laws. Accordingly, the trial court did not err insomuch as it held that implementing the arbitrator's award without reinstating access to these systems would compel the Commission to commit an illegal act.

Notwithstanding this conclusion, we will vacate the trial court's order. Although we find no fault with the trial court's determination that Hobart cannot currently return to the Department as a police officer, as the award provides, it is not at all clear to us that the award can never be implemented. What is currently before us is a dispute over implementation of an arbitrator's award, not the facial illegality of the award itself. The record created before the trial court reveals that Hobart *may*

12

have available administrative remedies before the state agencies administering the systems in question to regain access and thus be able to fulfill the duties of a police officer within the Department.

For instance, Webb, the Executive Director of JNET, testified that in order for OA to reconsider the suspension of an agency employee's access, the agency sponsor would have to request that it be reconsidered. (R.R. at 198a.) He further testified that an officer may file an individual appeal with his agency sponsor, and the agency sponsor has the option of whether or not to pursue the appeal with the JNET office on behalf of the individual. (*Id.* at 199a-200a.) In this instance, Hobart's agency sponsor is a member of the Department, although the record does not indicate precisely whom. If the agency sponsor wishes to pursue the appeal, he must request that JNET reconsider its decision and reinstate the individual's access. Webb testified that, as of the date of his deposition (August 15, 2017), OA had not received an official request to appeal Hobart's suspension. (*Id.* at 200a-201a.) Thus, although Chief Horner testified that he sent a letter to Webb, Lawson, and Nicholas Reich, security administrator of JNET, at least one of the recipients did not treat the letter as an official appeal. The record before the trial court, therefore, suggests that the Department may not have taken all the steps necessary to seek restoration of Hobart's access to the various information systems. Furthermore, the Court takes judicial notice that Hobart has filed an action in this Court's original jurisdiction against OA, PSP, and PennDOT, asserting violations of due process with regard to the termination of his access. Through that action, Hobart seeks a declaration as to his rights to challenge termination of his access and/or to reinstate access.[5]

---

[5] This action is docketed as *Hobart v. Governor's Office of Administration*, 462 M.D. 2017.

13

Although we cannot predict whether any efforts by the Department or Hobart to reinstate Hobart's access to JNET, CLEAN, and PennDOT's system will prove successful, we similarly will not predict their failure. By vacating the trial court's order and allowing the Department and Hobart a reasonable period of time to seek reinstatement of his access to these systems, we account for the possibility that the current legal impediment to implementation of the arbitrator's award might be removed. To be clear, we are not requiring the Department (or its agency sponsor) to advocate on Hobart's behalf or press the merits of Hobart's appeal. Rather, we are ordering the Department to perform any ministerial obligation it has to advance the proceedings. This outcome is consistent with our decision in *City of Beaver Falls v. Beaver Falls Police Association*, 77 A.3d 75 (Pa. Cmwlth. 2013), *appeal denied*, 89 A.3d 662 (Pa. 2014).

In *Beaver Falls*, a police officer (Perretta) temporarily disrobed himself at a local bar. As a result, Perretta's employer terminated his employment for conduct unbecoming an officer. Perretta, through his union, filed a grievance, and the matter proceeded to arbitration. By an award issued in 2009, the arbitrator converted the termination into a one-year disciplinary suspension without pay and directed that the employer reinstate Perretta. The arbitrator also retained jurisdiction over the matter to settle any disputes related to the award. The employer filed a petition to vacate with a trial court, which the trial court denied. Complying with the award, the employer informed Perretta of its intention to reinstate him via a letter sent in 2010. The employer, however, conditioned Perretta's reinstatement on (1) Perretta receiving recertification from MPOETC, and (2) Perretta undergoing a medical and psychological evaluation.

14

The psychological evaluation revealed that Perretta was not psychologically fit or capable of exercising appropriate judgment in the line of duty. Based upon this, MPOETC informed the employer that it would not be taking any formal action regarding recertifying Perretta, as the results of his psychological evaluation rendered him ineligible for certification. In turn, the employer opted to take no further action regarding Perretta's reinstatement. Thereafter, the arbitrator held a compliance hearing, after which he issued a supplemental award. The arbitrator determined that Perretta's MPOETC certification lapsed due to the employer's delay in implementing the original award and ordered the employer to pay Perretta back pay until the employer reinstated him. Further, the arbitrator directed the employer to act in good faith to meet any certification requirements that were necessary for purposes of recertifying Perretta. The employer filed with a trial court a petition to vacate the supplemental award, and the trial court denied the petition. The employer appealed to this Court, arguing that the supplemental award compelled the employer to commit an illegal act by reinstating a police officer who does not have MPOETC certification. The employer asserted that Perretta would not be able to receive recertification. On this issue, we opined:

> With regard to the matter of reinstatement, the [employer] asserts that the Arbitrator's award directs the [employer] to perform an illegal act, because it directs that [Perretta] be reinstated despite the [MPOETC's] determination that [Perretta] is ineligible to be recertified as a police officer based on his psychological evaluation. We disagree. The Arbitrator found that the [employer] failed to comply with the 2009 award, because the 2010 offer of reinstatement did not "amount to a clear, unequivocal and unconditional offer of current employment" and thus was not a "valid and sufficient offer." As the trial court aptly observed, [MPOETC] did not make a ruling on this issue, but, at best, merely rendered an informal advisory opinion. Indeed, in its letter to the [employer], [MPOETC]

15

> acknowledged that "since [Perretta] is neither currently certified nor had a pending application for certification, [MPOETC] will not be taking any formal action at this time." Furthermore, it is undisputed that the [employer] failed to apply to have [Perretta] recertified, thereby depriving [MPOETC] of the opportunity to issue a formal ruling. We, therefore, cannot conclude that [Perretta] was ineligible to be recertified as a police officer. As such, we cannot further conclude that the Arbitrator's award directs the [employer] to perform an illegal act. Until such time as [MPOETC] acts on an application for certification of [Perretta], this issue is premature.

*Beaver Falls*, 77 A.3d at 82.

Here, just as in *Beaver Falls*, it is premature to decide whether the award compels the Commission to perform an illegal act, such that it should be vacated by a court. This is a matter of award implementation. Until such a time that Hobart and the Department have exhausted all avenues of relief to regain Hobart's access to JNET, CLEAN, and PennDOT's system, the question of whether the award can be implemented without violation of law cannot be decided finally. We, therefore, will vacate the trial court's order and remand the matter to the trial court with instruction to stay the matter. Once Hobart and the Department have exhausted all avenues to reinstate Hobart's access to these systems, the trial court may then consider the question of whether the Commission can implement the award without violating the law.

## B. Trial Court's Scope of Review

Next, we address the FOP's argument that the trial court exceeded its narrow scope of review by considering matters such as the convenience to the Commission, the financial impact on the Department and its taxpayers, and the underlying facts of the arbitration. In its opinion, the trial court dismissed any notion that Hobart would be able to work in a capacity that does not expose him to restricted

16

information, calling such a solution "ridiculous." (R.R. at 700a.) In so doing, the trial court opined:

> The only way [the Commission] could have Mr. Hobart as a police officer is by providing him with a special room with no computer access to JNET. [The Commission] would then have to pay Mr. Hobart a police officer's salary for not performing his work and another officer for doing his own job and completing Mr. Hobart's work. This scenario would be a farce. Both [the Commission] and its citizens would be inconvenienced and overtaxed.

(*Id.*) Further, the trial court found that Hobart sexually stalked a female coworker and that the award would force Hobart's victim to continue working with him. (*Id.* at 699a.) The FOP argues that these considerations are beyond the trial court's scope of review.

As previously mentioned, the trial court's scope of review is one of narrow certiorari. This narrow review precludes the use of public policy considerations to vacate an arbitration award. *See Pa. State Police v. Pa. State Troopers Ass'n (Smith & Johnson)*, 741 A.2d 1248, 1252-53 (Pa. 1999). In rejecting the application of public policy considerations, our Supreme Court opined:

> We are unable to accept this position. Broadening the narrow certiorari scope of review to include a provision which would allow the courts to interfere with an arbitrator's award whenever that award could be deemed to be violative of "public policy"—however that nebulous concept may be defined by a particular appellate court—would greatly expand the scope of review in these matters. If we were to adopt the . . . recommendation to include this ill-defined term within the narrow certiorari scope of review, we would markedly increase the judiciary's role in Act 111 arbitration awards. This would undercut the legislature's intent of preventing protracted litigation in this arena.

*Id.*

17

While we agree that the convenience to the Commission, the financial impact on the Department and its taxpayers, and the underlying facts of the arbitration are matters beyond the scope of the trial court's review, we do not conclude that these considerations are reversible error. The crux of the trial court's decision centered on the fact that the award compelled the Department to commit an illegal act. The discussion regarding the burden to the Department and the taxpayers is auxiliary to that main holding, independent of the trial court's conclusion.

### C. Error in Factfinding

In the same vein, we also dispose of the FOP's third argument—that the trial court erred by basing its decision on an incorrect factual finding. Specifically, the FOP takes issue with the trial court finding that Hobart "sexually stalk[ed] victims, including a fellow officer," and that reinstating Hobart would compel the Commission to force a victim to work with Hobart. (R.R. at 699a.) Although the parties agree that this finding is unsupported by record evidence, we determine that it played no significant part in the trial court's conclusion that reinstating Hobart would compel the Commission to commit an illegal act.

### D. Substituting Judgment

Finally, the FOP argues that the trial court erred by substituting its judgment for that of the arbitrator. Specifically, the FOP argues that the trial court "felt the arbitrator should have considered the results and impact of his decision." (Appellant's Br. at 17.) By analyzing the results and impact of the award—including the burden to the Department and the taxpayers—the FOP argues that the trial court replaced the arbitrator's judgment with its own.

It is well-settled that a court may not substitute its own judgment for that of an arbitrator. *See Sch. Dist. of Phila. v. Cmwlth. Assoc. of Sch. Adm'rs,*

*Teamsters Local 502*, 160 A.3d 928, 933 (Pa. Cmwlth.), *appeal denied*, 172 A.3d 591 (Pa. 2013). Here, we conclude that did not happen. Rather, the trial court evaluated ramifications of award implementation not contemplated by the arbitrator. The trial court sought to answer if the award compelled the Commission to commit an illegal act. The arbitrator provided no judgment with respect to this question. While the trial court unnecessarily explored other ramifications of the award—*e.g.*, the burden to the Department and the taxpayers—these considerations were peripheral to the central conclusion. The trial court, therefore, did not substitute its judgment for that of the arbitrator.

## IV. CONCLUSION

For the reasons set forth above, we reject the majority of the FOP's contentions on appeal. Nonetheless, because implementation of the arbitrator's award in this case is possible if Hobart's access to JNET, CLEAN, and PennDOT's system is restored, we will vacate the trial court's award and remand with direction that the trial court stay the matter to allow the Department and Hobart to pursue with the appropriate agencies restoration of Hobart's access to those systems.

P. KEVIN BROBSON, Judge

19

# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Northern Berks Regional      :
Police Commission         :
                            :
        v.             :   No. 254 C.D. 2018
                            :
Berks County Fraternal Order  :
of Police, Lodge #71,       :
             Appellant   :

## O R D E R

AND NOW, this 31st day of October, 2018, the order of the Court of Common Pleas of Berks County (trial court) is VACATED, and the matter is REMANDED to the trial court for further proceedings consistent with the accompanying opinion.

Jurisdiction relinquished.

                               _____

                               P. KEVIN BROBSON, Judge

# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Northern Berks Regional Police    :
Commission    :
    :
            v.    : No. 254 C.D. 2018
    : Argued:  September 14, 2018
Berks County Fraternal Order of    :
Police, Lodge #71,    :
              Appellant    :


BEFORE:    HONORABLE P. KEVIN BROBSON, Judge
               HONORABLE ANNE E. COVEY, Judge
               HONORABLE DAN PELLEGRINI, Senior Judge (P.)


DISSENTING OPINION BY
SENIOR JUDGE PELLEGRINI        FILED:        October 31, 2018


The Court of Common Pleas of Berks County's (trial court) decision reversing the arbitration is cogent and well-reasoned. I wish I could affirm that decision. The majority opinion amending the arbitrator's decision in an attempt to make it more palatable is imaginative but impermissible. Yet I still wish I could join. However, because I am obligated to do so, I would reverse the trial court and reinstate the arbitrator's award. Let me explain.

## I.

The underlying facts are not in dispute. Charles Hobart (Hobart) was a police officer for the Northern Berks Regional Police Commission (Commission). Hobart had a file at work containing approximately 80 pages of documents that included photographs of women in lingerie, bathing suits and other revealing attire.

Several of the photographs showed women with exposed breast and vaginal areas and some showed women in bondage. Included within the file were several pages from the Pennsylvania Justice Network (JNET) system[1] containing photographs and information of five civilians and a fellow female police officer in the department. There is no dispute that Hobart used these photographs for masturbation in the Department's men's room.

There is also no dispute that because of his misuse of the JNET system, Hobart's access to the Department of Transportation (PennDOT), JNET and the Commonwealth Law Enforcement Assistance Network (CLEAN)[2] portals, which all police officers need to perform their jobs, was permanently revoked.

Notwithstanding all this, the arbitrator found there was not just cause for Hobart's termination, even though his access to the portals was permanently revoked and he may never be able to use those systems to apprehend criminals, which essentially means that he cannot give full value of his services for the salary that is paid to him by taxpayers.

---

[1] JNET is the Commonwealth's primary public safety and criminal justice computer information system. JNET's integrated justice portal provides a common online environment for authorized users to access public safety and criminal justice information. This critical information comes from various contributing municipal, county, state and federal agencies.

[2] CLEAN is used by the Commonwealth's criminal justice agencies to access driver's license and motor vehicle information, state criminal history record information, the Commonwealth's central registry for protection from abuse orders, law enforcement messaging capabilities, and a host of other services.

If this were the outcome of a jury trial, I would reverse the jury's verdict because no reasonable person could find that Hobart's conduct in gathering pictures from official sources – including those of a fellow female police officer – so that he could masturbate in the Department's men's room, causing him to be permanently banned from access to the PennDOT, JNET and CLEAN portals necessary for an officer to perform his job, is not just cause for dismissal.

Even though I would hold that no reasonable person would agree with the arbitrator's outcome, I cannot do what any reasonable person would do and reverse the arbitrator because this Court is forced to apply the narrow certiorari test rather than the judgment notwithstanding the verdict (nov)/error of law standard that the General Assembly provided to be used in reviewing public employee grievance arbitration, including grievance arbitration involving police officers. Now let us take a look at the statutory standard for courts to use to review arbitration awards.

## II.

## A.

In the Uniform Arbitration Act of 1980 (UAA), 42 Pa.C.S. §§ 7301 - 7362, the General Assembly set forth the scope of judicial review of public sector agreements, including employee grievance arbitration of disputes. Section 7302(b) of the UAA provides the standard of review for grievance arbitrations arising out of a public collective bargaining agreement. Quoted in full, it provides:

> (a) General rule.—An agreement to arbitrate a controversy on a nonjudicial basis shall be conclusively presumed to be an agreement to arbitrate pursuant to Subchapter B (relating to common law arbitration) unless the agreement to

arbitrate is in writing and expressly provides for arbitration pursuant to this subchapter or any other similar statute, in which case the arbitration shall be governed by this subchapter.

(b) **Collective bargaining agreements.—This subchapter shall apply to a collective bargaining agreement to arbitrate controversies between employers and employees or their respective representatives only where the arbitration pursuant to this subchapter is consistent with any statute regulating labor and management relations.**

(c) Government contracts.—This subchapter shall apply to any written contract to which a government unit of this Commonwealth is a party to the same extent as if the government unit were a private person, except that where a contract to which the Commonwealth government is a party provides for arbitration of controversies but does not provide for arbitration pursuant to any specified statutory provision, the arbitration shall be governed by this subchapter.

(d) Special application.—

    (1) Paragraph (2) shall be applicable where:

        (i) The Commonwealth government submits a controversy to arbitration.

        (ii) **A political subdivision submits a controversy with an employee or a representative of employees to arbitration.**

        (iii) Any person has been required by law to submit or to agree to submit a controversy to arbitration pursuant to this subchapter.

    (2) Where this paragraph is applicable a court in reviewing an arbitration award pursuant to this subchapter shall, **notwithstanding any other provision of this subchapter, modify or correct the award where the award is contrary to law and is such that had it been a**

> **verdict of a jury the court would have entered a different judgment or a judgment notwithstanding the verdict.**

42 Pa.C.S. § 7302 (emphases added).

The reason I cannot apply the judgment nov/error of law standard that governs grievance arbitrations, including those involving police officers, is because our Supreme Court has issued several decisions that preclude applying the legislatively prescribed mandate. First, a short history of the development of standards of review regarding appeals from grievance arbitration awards is in order.

### B.

Our Supreme Court has continued to apply the "essence test" standard of review[3] in the context of grievance arbitration under the Public Employe Relations

---

[3] Under the essence test, the court makes an initial determination as to whether the issue is embraced by the agreement giving the arbitrator the authority to hear the matter. If so, the award is upheld if it can be rationally derived from the agreement, allowing reversal only where the award is genuine and indisputably without foundation in or fails to logically flow from the agreement. The essence test requires a determination of whether the agreement encompasses the subject matter of the dispute. *See State System of Higher Education (Cheyney University) v. State College University Professional Association (PSEA-NEA)*, 743 A.2d 405 (Pa. 1999); *Leechburg Area School District v. Dale*, 424 A.2d 1309 (Pa. 1981).

The origin of the test comes from the seminal *Steelworkers* trilogy of cases. *See United Steelworkers of America v. Enterprise Wheel and Car Corporation*, 363 U.S. 593 (1960); *United Steelworkers v. American Manufacturing Company*, 363 U.S. 564 (1960); *United Steelworkers v. Warrior and Gulf Navigation Company*, 363 U.S. 574 (1960); *see also Major League Baseball Players Association v. Garvey*, 532 U.S. 504 (2001). Those cases dealt with the standard to be used to review grievance arbitration awards under the federal Labor Management Relations Act of 1947, 29 U.S.C. §§ 141 – 197.

**(Footnote continued on next page…)**

Act (Act 195),[4] though recognizing the UAA judgment nov/error of law standard is what the General Assembly has said is to be used in reviewing all public sector grievance arbitration cases, because it views the essence test as essentially the same as the judgment nov scope of review. The Supreme Court held in *Community College of Beaver County v. Community College of Beaver County, Society of the Faculty (PSEA/NEA)*, 375 A.2d 1267, 1273 (Pa. 1977), that the "introduction of the 'n.o.v.' concept . . . is hardly a radical change, nor does it dictate that a much closer or different scrutiny of an arbitration award will be available than under the [essence test]." This case, however, was decided under the Arbitration Act of 1927, which had a judgment nov standard, but did not expressly apply to public sector collective bargaining agreements as did the UAA. *See Pennsylvania State Education Association v. Appalachia Intermediate Unit 08*, 476 A.2d 360, 362-63 (Pa. 1984) (holding that the section of the UAA governing power of a reviewing court to modify

---

**(continued…)**

Unlike the Public Employe Relations Act (Act 195), Act of July 23, 1970, P.L. 563, *as amended*, 43 P.S. §§1101.101 – 1101.2301, the federal Labor Management Relations Act of 1947 does not make arbitration mandatory; rather, it must be agreed to and made part of a collective bargaining contract. Section 301, 29 U.S.C. § 185, provides that suits may be brought demanding specific performance of collective bargaining agreements. "As the [House and Senate] Conference Report state, '[o]nce the parties made a collective bargaining contract, the enforcement of that contract should be left to the usual processes of law . . . .'" *Textile Workers of America v. Lincoln Mills of Alabama*, 353 U.S. 448, 452 (1957).

It is worthwhile to note that Act 195, even though it requires arbitration, does not provide for a scope of review. When Act 195 was enacted, the Arbitration Act of 1927, 5 P.S. §§ 161 – 181, *repealed by* the Act of October 5, 1980, P.L 693, which applied to all public contracts, provided for the judgment nov standard. 42 Pa.C.S. § 7302 provides the standard of review of grievance arbitration awards.

[4] Act of July 23, 1970, P.L. 563, *as amended*, 43 P.S. §§ 1101.101 – 1101.2301.

DRP - 6

or correct an arbitration award is a substantial reenactment of the corresponding provision of the Arbitration Act of 1927). In considering a motion for judgment nov, the court must view the evidence and all reasonable inferences that arise from the evidence in a light most favorable to the verdict winner. The court can enter judgment nov only if "no two reasonable persons could fail to agree that the verdict is improper." *Northwest Savings Association v. Distler*, 511 A.2d 824, 825 (Pa. Super. 1986).

Our Supreme Court has, through a variety of exceptions, albeit by a different name but with the same goal – the public policy exception,[5] which replaced the core functions test,[6] which replaced the manifestly unreasonable test[7] – made the essence test the same as the judgment nov/error of law test.

---

[5] The public policy exception requires the application of a three-prong test:

> First, the nature of the conduct leading to the discipline must be identified. Second, we must determine if that conduct implicates a public policy which is "well-defined, dominant, and ascertained by reference to the laws and legal precedents and not from general considerations of supposed public interests." Third, we must determine if the arbitrator's award poses an unacceptable risk that it will undermine the implicated policy and cause the public employer to breach its lawful obligations or public duty, given the particular circumstances at hand and the factual findings of the arbitrator.

*City of Bradford v. Teamsters Local Union No. 110*, 25 A.3d 408, 414 (Pa. Cmwlth. 2011) (quoting *Westmoreland Intermediate Unit # 7 v. Westmoreland Intermediate Unit # 7 Classroom Assistants Educational Support Personnel Association, PSEA/NEA*, 939 A.2d 855, 866 (Pa. 2007)) (citations omitted).

[6] In *City of Easton v. American Federation of State, County and Municipal Employees, AFL-CIO, Local 447*, 756 A.2d 1107 (Pa. 2000), *abrogated by Westmoreland*, 939 A.2d 855, an arbitrator who required reinstatement of an employee determined to have engaged in egregious misconduct that strikes at the very core function of public enterprise, deprived an employer of its **(Footnote continued on next page…)**

## III.

## A.

However, what is before us is the review of an Act 111[8] grievance arbitration award.  Our Supreme Court has applied the narrow certiorari test rather than the essence test to police and firefighter grievance arbitrations, notwithstanding that the UAA provides for a judgment nov/error of law standard for all arbitrations.

Act 111 was enacted following a 1968 constitutional amendment to amend Article III, Section 31[9] of the Pennsylvania Constitution that provided an

---

**(continued…)**

ability to perform essential functions, including the ability to discharge, and the arbitrator's award was deemed irrational and, therefore, failed the essence test.

[7] The "manifestly unreasonable" standard applied where an arbitrator found:

> [A] public employee engages in outrageous conduct that amounts to or almost arises to the level of criminality, and the conduct of those employees is toward a group of people that they serve, protect, or have a special relationship to, or is a breach of a special trust, then it is 'manifestly unreasonable' to conclude that the public employer could have intended to bargain away its absolute responsibility to ensure the integrity of its agency, and thus, the arbitrator must affirm the dismissal once a finding of just cause has been made.

*American Federation of State, County, and Municipal Employees Local 2026, District Council 83, AFL-CIO v. Borough of State College,* 578 A.2d 48, 51 (Pa. Cmwlth. 1990).  *See also Philadelphia Housing Authority v. Union of Security Officers # 1*, 455 A.2d 625 (Pa. 1983); *County of Centre v. Musser*, 548 A.2d 1194 (Pa. 1988); *Pennsylvania Liquor Control Board v. Independent State Stores Union*, 553 A.2d 948 (Pa. 1989).

[8] Act of June 24, 1968, P.L. 237, No. 111, *as amended*, 43 P.S. §§ 217.1 – 217.10.

[9] It now reads, with the amendment in italics:

**(Footnote continued on next page…)**

exception to the prohibition of the delegation of a municipal function to a private individual by authorizing the General Assembly to enact legislation to allow a private arbitrator to set the terms and conditions of employment for police and firefighters. Grievance arbitration, however, was not constitutionally prohibited prior to this amendment. This is evident by the requirement of mandatory grievance arbitration contained in Act 195 which would not have been possible if it were unconstitutional. *Erie Firefighters Local No. 293 of the International Association of Firefighters v. Gardner*, 178 A.2d 691 (Pa. 1962).

---

**(continued…)**

> The General Assembly shall not delegate to any special commission, private corporation or association, any power to make, supervise or interfere with any municipal improvement, money, property or effects, whether held in trust or otherwise, or to levy taxes or perform any municipal function whatever.
>
> *Notwithstanding the foregoing limitation or any other provision of the Constitution, the General Assembly may enact laws which provide that the findings of panels or commissions, selected and acting in accordance with law for the adjustment or settlement of grievances or disputes or for collective bargaining between policemen and firemen and their public employers shall be binding upon all parties and shall constitute a mandate to the head of the political subdivision which is the employer, or to the appropriate officer of the Commonwealth if the Commonwealth is the employer, with respect to matters which can be remedied by administrative action, and to the lawmaking body of such political subdivision or of the Commonwealth, with respect to matters which require legislative action, to take the action necessary to carry out such findings.*

Pa. Const. art. 3, § 31.  (Emphasis added.)

It outlines a procedure for uniformed personnel to engage in such bargaining that culminates in binding interest arbitration pursuant to specified procedures. Through those procedures, a collective bargaining contract or an interest arbitration award would govern the terms and conditions of employment. The provisions of Act 111 deal mainly with interest arbitration and the resolution of grievances are barely mentioned in Act 111 except for one brief reference in Section 1, 3 P.S. § 217.1, that mentions "settlement of grievances".[10] Unlike Section 903 of Act 195,[11] Act 111 does not expressly mandate grievance arbitration. *See also Upper Makefield Township v. Pennsylvania Labor Relations Board*, 717 A.2d 598, 601-03 (Pa. Cmwlth. 1998), *aff'd on other grounds*, 753 A.2d 803 (Pa. 2000). Until the Pennsylvania Supreme Court's decision in *Betancourt*, there was a dispute over whether Act 111 even provided for grievance arbitration. *See Pennsylvania State Police v. Pennsylvania State Troopers' Association (Betancourt)*, 656 A.2d 83, 87 (Pa. 1995).

There is no scope of review for arbitration awards contained in Act 111. No scope of review was needed, though, since Section 7 of Act 111 states that "[n]o appeal [from an arbitration award] shall be allowed to any court." 43 P.S. § 217.7(a). Shortly after Act 111 was enacted, our Supreme Court in *City of Washington v.*

---

[10] While Act 111 does, in passing, mention settlement of grievances, based on the history behind the amendment to Pennsylvania Constitution art. 3, § 31 and Act 111, which involves the right to interest arbitration, a better interpretation is that when Act 111 refers to settlement of grievances, it is not referring to grievance arbitration but to grievances relating to terms of conditions of employment, not grievances arising out of the contract. *See also Erie Firefighters Local No. 293.*

[11] 43 P.S. § 1101.903.

*Police Department of Washington (Washington Arbitration)*, 259 A.2d 437, 441 (Pa. 1969), held that the narrow certiorari scope of review applied to an appeal of an Act 111 interest arbitration award.

At that time, the narrow certiorari test was common. There were many categories of administrative decisions where the General Assembly had stated there should be no right of appeal to a court from that administrative determination. Other statutes were silent as to whether a party had the right to appeal the administrative decision. Even though the statute prohibited any appeal or did not authorize an appeal, our Supreme Court dealt with this matter by adopting rules that addressed each of those situations. It provided for a narrow certiorari scope of review for appeals brought when the statute said there would be no appeal from an agency decision. However, where the statute was silent on the right to appeal, our Supreme Court adopted a broad certiorari standard, similar to the administrative agency scope of review. No matter which standard of review applied, an appeal was by petition for allowance of appeal and not by right. This is why the narrow certiorari test was applied to review police and firefighter arbitration awards.

After Article V, Section 9 of the Pennsylvania Constitution[12] was adopted in 1968, providing for the right of appeal of all common pleas and administrative agency decisions, the narrow and broad certiorari standards of review

_____

[12] Article V, Section 9 provides that: "There shall be a right of appeal in all cases to a court of record from a court not of record; and there shall also be a right of appeal from a court of record or from an administrative agency to a court of record or to an appellate court, the selection of such court to be as provided by law; and there shall be such other rights of appeal as may be provided by law." Pa. Const. art. 5, § 9.

were abandoned as no longer necessary and the rules that created those standards are no longer extant. All other appeals previously not permitted were now allowed under the statutory standard of review, such as that in the Administrative Agency Law.[13] The only appeals for which the vestigial court-created narrow certiorari standard still apply are appeals from police and firefighter arbitration awards.[14]

## B.

The issue of whether police grievance arbitration awards as opposed to interest arbitration awards were governed by narrow certiorari was not decided until almost 30 years after the enactment of Act 111. In *Betancourt*, our Supreme Court, while acknowledging that Act 111 provided detailed procedures for interest arbitration and how it was to be conducted, provided no such direction for grievance arbitration. The Court decided that since Act 111 purportedly authorized grievance arbitration for police and firefighter personnel, it was the intent of the General Assembly in Act 111 to impose a restraint on judicial activism in order to ensure swift resolution of disputes involving police and firefighters that made the narrow certiorari standard applicable, not the judgment nov/error of law/essence test. It stated:

> We are not persuaded that the legislature intended *grievance* arbitration awards to be subject to broader judicial review than are *interest* arbitration awards. There is no indication, either in the Act itself or in the history of the Act, that the legislature intended appeals from grievance arbitration awards to be subject to greater judicial

---

[13] 2 Pa.C.S. §§ 501 - 508, 701 - 704.

[14] For a full discussion of this issue, see *MEC Pennsylvania Racing v. Pennsylvania State Horse Racing Commission*, 827 A.2d 580, 586-87 (Pa. Cmwlth. 2003).

> involvement than interest arbitration awards. We will not now allow a scope of review [essence test] which is markedly broader than narrow certiorari for Act 111 grievance arbitration. To do so would allow the courts to interfere impermissibly with the legislative scheme as the courts would be able to alter Act 111 arbitration awards by means of an unauthorized expansion of the proper scope of review. Such a result would run counter to the legislature's intent. Thus, we hold that the proper scope of review is narrow certiorari.

*Betancourt*, 656 A.2d at 89 (emphasis in original).

As a result of *Betancourt,* the application of the narrow certiorari test means that courts could not review arbitrator decisions that reinstate police officers who engage in illegal conduct. *See Pennsylvania State Police v. Pennsylvania State Troopers Association (Smith)*, 741 A.2d 1248 (Pa. 1999) (holding that the Court could not disturb an arbitrator's reinstatement of a state trooper who jammed his loaded, police-issued weapon into his ex-girlfriend's mouth and threatened to kill her, as well as later being arrested that day for driving under the influence, simple assault, and making terroristic threats, charges to which he subsequently pleaded guilty); *City of Philadelphia v. Fraternal Order of Police, Lodge No. 5*, 711 A.2d 1060 (Pa. Cmwlth. 1998) (holding that the Court could not disturb an arbitrator's reinstatement of a Philadelphia police officer who crashed her police cruiser into parked cars while under the influence of alcohol and cocaine).

Not only did the *Betancourt* decision limit the ability of courts to review disciplinary decisions involving criminal conduct, it also limited the ability of courts to review an arbitration award in which an arbitrator has essentially rewritten the

parties' agreement or issued an award that is so illogical that the parties never intended the result. For example, in *Bensalem Township v. Bensalem Township Police Benevolent Association*, 803 A.2d 239 (Pa. Cmwlth. 2002), we held that we could not review an arbitrator's award that clearly violated the provisions of the collective bargaining agreement. In that case, the township discharged a police officer who was subsequently reinstated by an arbitrator. The collective bargaining agreement prohibited an arbitrator from awarding monetary relief in excess of one year. The narrow certiorari test prevented the Court from examining an arbitrator's award that not only reinstated the police officer, but awarded him 21 months' back pay and benefits – nine months more than the parties authorized under the collective bargaining agreement.

## C.

I respectfully urge our Supreme Court to reexamine its holding in *Betancourt*. Making any attempt to divine the intent from Act 111 as to what standard of review should apply is unwarranted. This is especially so when the General Assembly has provided in the UAA, 42 Pa.C.S. § 7302, in plain and mandatory language, that the judgment nov/error of law standard should be used to review all collective bargaining grievance arbitrations. This was not an accident. When adopting the National Uniform Arbitration Act, the General Assembly inserted 42 Pa.C.S. § 7302 into that act to set the judgment nov/error of law standard. It could not be clearer.

Because the UAA is clear as to the standard of review in grievance arbitration cases, it is not necessary to discuss the factors relied on in *Betancourt* to

justify its adoption of the narrow certiorari test. However, a short discussion of the factors relied on in *Betancourt* to find that the narrow certiorari test applied are in order. One factor mentioned in *Betancourt* is that courts would impermissibly interfere with police and firefighter arbitration awards and those appeals would get bogged down in the courts if the judgment nov/error of law/essence test applied. That fear is simply not warranted. Even though the judgment nov/error of law standard allows slightly more judicial oversight than the essence test, it is not an intrusive scope of review. This test was formulated so courts would be deferential to arbitration awards and intervene only where an arbitrator clearly did not satisfy his obligation to interpret the collective bargaining agreement or acted in a way that no reasonable person could accept the outcome. Moreover, the same judicial procedures essentially are followed regardless of whether the arbitration award is reviewed under the narrow certiorari scope of review or the essence test, and the essence test is not mired in protracted litigation.

Finally, applying the narrow certiorari test does not serve the public interest because it does not allow courts to review arbitration awards to determine whether an award sanctions a police officer's conduct that harms the public, breaches the public trust or brings discredit on the ability of the police department to carry out its functions. If the judgment nov/error of law test applies, courts could review the decision of the arbitrator, a private party, to determine if his decision was against public policy. *See Philadelphia Housing Authority v. American Federation of State, County and Municipal Employees, District Council 33, Local 934*, 52 A.3d 1117 (Pa. 2012) (holding that an arbitration award reinstating an employee discharged for acts constituting sexual harassment violated well-defined and dominant public policy).

Courts could also review the conduct in this case to determine whether any reasonable person would arrive at the same decision that this arbitrator did.

Now to this appeal and why I am compelled to dissent.

## IV.

In this case, the trial court concluded that the arbitrator exceeded his powers by ordering the Commission to return Hobart to his position when he would not have access to PennDOT, JNET and CLEAN records. The trial court also found that because Hobart would be in the area where the computers were located, he could potentially see data that he was not entitled to see, risking the Commission's continued access to those portals. The trial court found that Hobart sexually stalked a female coworker and that the award would force Hobart's victim to continue working with him.[15]

The majority, while substantially agreeing with the trial court, nonetheless vacated the order because it found it was premature to decide whether the award putting Hobart back to work compels the Commission to be at risk for losing access to PennDOT, JNET and CLEAN's systems, as well as potential criminal liability if Hobart happens to see any protected data generated by those systems. It then modified the trial court's order finding just cause to dismiss by ordering that until such a time that Hobart and the Department have exhausted all avenues of relief

---

[15] I note that in its brief, the Berks County Fraternal Order of Police, Lodge #71 (FOP) disputes the claim that a female coworker was stalked because there are no women police officers employed by the Department.

to regain Hobart's access to PennDOT, JNET and CLEAN's systems, the question of whether the award can be implemented without violation of law cannot be decided finally. It then vacated the trial court's order and remanded the matter to the trial court with instruction to stay the matter until Hobart and the Department have exhausted all avenues to reinstate Hobart's access to these systems, at which time the trial court may then consider the question of whether the Commission can implement the award without violating the law. The net effect is that if Hobart does not get his permanent revocations to PennDOT, JNET and CLEAN's systems reversed, then the arbitrator's decision will be reversed.

I disagree with the majority because nothing that the arbitrator ordered would cause the Commission to commit an illegal act.[16] Nothing in the arbitrator's award requires that the Commission give Hobart access to those portals, only that it continue to employ him as a police officer. Under the award, it is up to the Commission to fashion a position in which Hobart would not have access to that information. While not having access to those portals would limit his usefulness and cause expense and difficulty within the Commission, to fashion such an award does not require the Commission to perform an illegal act. Unfortunately, under the narrow certiorari test, added expense and inconvenience does not justify a reversal of the arbitrator's award.

---

[16] I also disagree with the majority vacating the trial court's decision to await exhaustion of all avenues to reinstate Hobart's access to the systems. Arbitrators decide grievance arbitration cases as they find them, and the trial court, not being the factfinder, reviews the arbitrator's award as issued.

While the arbitrator's award is unreasonable, under the narrow certiorari standard, because the arbitrator had the right to determine whether there was just cause for termination, the award did not order the Commission to do anything illegal and there was no deprivation of anyone's constitutional rights, I would reinstate the arbitrator's award and reverse the trial court. Accordingly, I respectfully dissent.

_____
DAN PELLEGRINI, Senior Judge