**IN THE SUPREME COURT OF PENNSYLVANIA**
**MIDDLE DISTRICT**

**SAYLOR, C.J., BAER, TODD, DONOHUE, DOUGHERTY, WECHT, MUNDY, JJ.**

| | |
|---|---|
| NORTHERN BERKS REGIONAL POLICE COMMISSION, | : No. 53 MAP 2019 |
| | : |
| | : Appeal from the Order of the |
| Appellant | : Commonwealth Court at No. 254 CD |
| | : 2018 dated October 31, 2018 |
| | : Vacating the Order of the Berks |
| v. | : County Court of Common Pleas, |
| | : Civil Division, at No. 2017-14202 |
| | : dated November 14, 2017 |
| BERKS COUNTY FRATERNAL ORDER | : |
| OF POLICE, LODGE #71, | : ARGUED: November 21, 2019 |
| | : |
| Appellee | : |

**OPINION**

**JUSTICE DONOHUE**                                           **DECIDED: May 19, 2020**

We granted the Northern Berks Regional Police Commission's ("Commission") petition for appeal in this Act 111[1] grievance arbitration appeal. An arbitrator reinstated Officer Charles Hobart ("Hobart") to the Northern Berks Police Department ("Department"), but the trial court vacated the award based on a finding that the award required the Department to commit an illegal act. The trial court's ruling was based on factual developments occurring after Hobart's termination. The Commonwealth Court reversed, finding that Hobart had not yet exhausted administrative remedies that would theoretically remove the purported illegality. For the reasons set forth herein, we find that

---

[1] Act 111 is the common name for the Police and Firemen Collective Bargaining Act, 43 P.S. §§ 217.1–217.10.

the award of the arbitrator was not illegal and reverse the decision of the Commonwealth Court.

I.      **Factual and Procedural History**

On September 13, 2016, a Department officer rummaged through Hobart's desk while looking for motor vehicle report forms.  Arbitrator's Opinion, 5/30/17, at 3.  The officer discovered a folder containing approximately eighty pages of documents falling within two relevant categories.   The first category was photographs of women downloaded from the internet, which included photos of women in lingerie and bathing suits, while others were pornographic and showed women in bondage and varying stages of undress.  The second category was material that Hobart had saved and printed from the Pennsylvania Judicial Network ("JNET"), the primary computer interface used by police officers to rapidly access information needed for efficient day-to-day police work.[2] Hobart's JNET material was largely if not exclusively comprised of seven photographs of attractive young women that Hobart apparently saved from unauthorized JNET searches and then printed them using police department equipment and supplies.  Hobart admitted that he took photographs into the departmental bathroom and masturbated.

---

[2]  JNET operates as a data broker and directs a user's inquiry to databases owned and operated by other agencies, returning the search results to the user.  For example, an officer looking for warrant information requests that information through JNET, which in turn connects to the Administrative Office of Pennsylvania Courts and the Pennsylvania State Police; a request for driver's license information is sent to PennDOT; a request for criminal history information is obtained through various federal and state databases, such as the Pennsylvania State Police's Commonwealth Law Enforcement Assistance Network ("CLEAN").  *See* Deposition of Eric Webb, 8/15/17, at 22-24.

The parties have at times generically referred to JNET as a shorthand for all of the information accessible through its interface.  As the ability to access any subset of the information available through JNET via other means is not at issue, we likewise refer to JNET in that generic sense.

Within twenty-four hours of the folder's discovery, Officer Robert Wood, Jr., who was delegated by JNET to manage the Department's JNET access, immediately requested a suspension of Hobart's access privileges pending further review. Officer Wood then prepared a report dated September 26, 2016 summarizing Hobart's misuse of his access, which he transmitted to JNET. Under the "Requested Action" box Officer Wood wrote, "Suspension of Officer Hobart's access until final determination of disciplinary action is made." N.T., 10/26/17, at 160. The next day Chief of Police Scott Eaken issued a notice of disciplinary action to Hobart, recommending his termination. The notice cited a number of Departmental policies and general orders that Hobart violated, including failing to maintain a level of moral conduct in his police work, bringing disrepute to the office, collecting personal information of individuals for private use, and abusing his power. The Commission terminated Hobart on September 27, 2016.

The Fraternal Order of Police, Lodge #71 ("FOP") filed a grievance. In response, the Department denied its material allegations, leading to arbitration. The Commission and the FOP appeared before the arbitrator on March 22, 2017. The arbitrator received testimony and documentary evidence. The arbitrator framed the issue as "whether the Commission had just cause to discharge [Hobart] and, if not, what shall be the remedy?" Arbitrator's Opinion, 5/30/17, at 4. The Commission's argument "focuse[d] on [Hobart]'s misuse of the JNET [system]" and his abus[ing] the public trust extended to every sworn officer who utilizes these police informational services." *Id.* at 5. The Commission did not justify its termination of Hobart by citing any particular component of Hobart's JNET violations in terms of his fitness to serve as a police officer. Rather, the Commission claimed that Hobart's improper use of JNET, with its "access to personal information on

millions of citizens," *id.*, was enough as a generic matter to warrant termination. Chief Eaken "testified that the activities engaged in by [Hobart], aside from his use of JNET, could have been done at [Hobart]'s home and that would have been his business." *Id.* at 8. He cited the fact that Hobart used Department computers and printers to commit the JNET violations as a relevant factor and "admitted that if the JNET violations were separated from the other matters, [Hobart] would 'probably not' have been terminated." *Id.* at 9. There was no evidence that Hobart ever attempted to contact any of the women he looked up on JNET, and the targets of Hobart's searches were unaware of his activities.

The FOP conceded that Hobart was warned of possible discipline and that the cited general orders were reasonable and related to efficient and safe operation of the police department.[3] It argued, however, that the Commission "did not apply its rules, orders and penalties evenhandedly and without discrimination," and that termination was "disproportional when compared to the discipline issued to Officer DeBlasi," *id.* at 6, who had committed thousands of JNET violations yet had received only a four-day suspension.

---

[3] The arbitrator's written opinion quoted the notice of disciplinary action issued to Hobart. Within, Chief Eaken listed twelve separate violations, including: "Failed to uphold his commitment to the Oath of Office by failing to conduct himself with faithfulness to an obligation, trust or duty"; violating "rules, regulations, guidelines . . . as listed within this Notice"; "abus[ed] his position of authority ... [and] misappropriated department property"; "Failed to maintain a level of moral conduct in his business affairs in keeping with the highest standards of the law enforcement profession"; "Participated in indecent acts involving moral turpitude impairing his ability to perform as a law enforcement officer"; "[B]rought the department into disrepute"; "Failed to utilize departmental equipment only for its intended purpose"; "Abused his power by using his position for personal gain"; "Misused Department time"; and "Failed to use the internet at all times in a manner that benefits the [Department]." Arbitrator's Opinion, 5/30/17, at 6-7, n.4.

The arbitrator agreed with the FOP and issued an award and accompanying opinion on May 30, 2017, reinstating Hobart. The opinion extensively focused on the comparative discipline issue argued by the FOP. The arbitrator quoted the notice of disciplinary action given to DeBlasi, which established that he "used JNET improperly for personal use on a daily basis (each day that he worked) for approximately 3 years, improperly accessing many thousands of JNET records on the system." *Id*. at 11. The Commission sought to justify the disparate treatment by arguing that Hobart produced and kept hard copies of the information he obtained whereas DeBlasi had not done so. The arbitrator did not find that distinction convincing because "the information would obviously be easily retrievable to Officer DeBlasi by simply performing another improper JNET query," *id.* at 14, and in any event the extent to which Officer DeBlasi used the information was not clear. Additionally, in Officer DeBlasi's case the Chief "spent [six] months going over the JNET records that Officer DiBlasi accessed to see if he could find any nexus with the work of the Department." *Id*. at 12. He could not. Thus, Hobart and Officer DeBlasi both violated JNET policies by obtaining information that had no legitimate law enforcement purpose.

The arbitrator determined that "the punishment assessed to [Hobart] is glaringly disproportionate to the offense." *Id*. at 14. Unlike Officer DeBlasi's thousands of JNET violations, the Commission identified only six civilians who were targets of Hobart's improper JNET searches. The arbitrator accepted the testimony of his co-workers who "generally regarded [Hobart] as a good police officer and friend within the Department." *Id*. at 14. The conduct, while disturbing, "does not appear to have influenced his interactions with his co-workers or his general police work for the Commission." *Id*. at 14-

15. Furthermore, Hobart began receiving therapy and "demonstrated a strong intent to follow all medical and/or psychological advice and or direction." *Id.* at 15. The arbitrator determined that Hobart's conduct in total warranted "a severe punishment." *Id.* at 16. He was troubled by Hobart's use of Departmental property to print risqué and pornographic pictures and his unsavory activities in the building's bathroom. He awarded reinstatement with the time off converted into a disciplinary suspension without back pay.[4]

The Commission filed a Petition to Vacate with the Berks County Court of Common Pleas, alleging that the arbitrator "exceeded his powers in ordering Hobart back to work." Petition to Vacate, 6/27/17 at 10. The scope of review applied when reviewing Act 111 awards is in the nature of narrow certiorari, with the reviewing court limited "to questions regarding: (1) the jurisdiction of the arbitrators; (2) the regularity of the proceedings; (3) an excess of the arbitrator's powers; and (4) deprivation of constitutional rights." *PSP v. PSTA,* 656 A.2d 83, 85 (Pa. 1995) ("*Betancourt*"). A plenary standard of review governs "the preliminary determination of whether the issue involved implicates one of the four areas of inquiry encompassed by narrow certiorari*,* thus allowing for non-deferential review." *City of Philadelphia v. FOP Lodge No. 5 (Breary)*, 985 A.2d 1259, 1266 (Pa. 2009). Here, the Commission argued that the "excess of powers" prong was implicated because the Commission could not lawfully return Hobart to work, which qualifies under the third prong. *Dep't of Corr. v. Pennsylvania State Corr. Officers Ass'n*, 12 A.3d 346, 356 (Pa. 2011).

---

[4] Assuming reinstatement was effective on the date of the award, the disciplinary suspension, without pay, was for a period of eight months.

The purported illegality was predicated on factual developments post-dating Hobart's termination. The Commission's petition included a letter from JNET establishing that Hobart's access was terminated as of February 22, 2017, i.e. after Hobart's termination but before the arbitration hearing. The letter summarized the infractions that JNET had substantiated through its independent investigation. As relevant to the ensuing proceedings, JNET indicated that the decision could be appealed.

> You may appeal this sanction by providing a letter to your JNET Sponsor requesting that the sanction be modified or removed and that your account be reinstated. The letter must provide proof that there was an error made. If the appeal has merit, your agency Sponsor will forward the appeal to the JNET Security Administrator for consideration by the JNET Executive Director [Eric Webb].

N.T., 10/26/17, at 163.

Before the trial court, the Commission argued that without JNET access, "a police officer cannot perform his job." Petition to Vacate, 6/27/17 at 4, ¶ 26. In turn, employing Hobart would require the Commission to violate numerous federal and state laws. The pleading cited, inter alia, the Computer Fraud and Abuse Act, 18 U.S.C. § 1030; the Unlawful Use of Computer and Other Computer Crimes statute, 18 Pa.C.S. § 7611(a); the Electronic Communications Privacy Act, 18 U.S.C. §§ 2511, 2701; the Pennsylvania Wiretapping and Electronic Surveillance Act, 18 Pa.C.S. § 5701; and the Driver's Privacy Protection Act, 18 U.S.C. §§ 2721-22. Broadly speaking, the cited laws either criminalize accessing computer systems without proper authorization or prohibit the dissemination of protected criminal history information such as that accessible through JNET. *See* e.g. 18 U.S.C. § 1030(a)(2)(B) (criminalizing "intentionally access[ing] a computer without authorization or exceeds authorized access, and thereby obtains ... information from any

department or agency of the United States"). In this respect, the Commission drew no distinction between Hobart himself accessing the systems versus the Commission accessing the systems on his behalf in order to facilitate his police work.[5]

The petition further alleged that the Commission attempted to raise the issue of Hobart's JNET access to the arbitrator. "The Commission's witnesses testified and provided documentary evidence that Hobart had been permanently suspended from being able to access JNET." Petition to Vacate, 6/27/17, at 4, ¶ 23. However, the arbitrator "did not allow Commission witnesses to elaborate as to specifically what duties a police officer cannot do without access to JNET." *Id.* at ¶ 27. Regarding restoration of his JNET access through administrative avenues, the petition stated that Hobart "had the ability to appeal," but characterized any appeal as a fait accompli because the appeal "must be based on a showing that there had been an error made in the initial investigation." *Id.* at ¶ 24. According to the petition, Hobart admitted to the violations during the internal investigation meaning "it would be virtually impossible for [Hobart] to prove that an error had been made." *Id.* at ¶ 25. The petition attached several exhibits corroborating the averments, including an email from new Chief of Police Horner to JNET that forwarded an appeal letter authored by Hobart. *Id.* at Exhibit D-1.

---

[5] The Commission did not specifically discuss the statutory language of each law and failed to develop how the Commission would violate these laws under, inter alia, the mens reas of these crimes if it simply refrained from giving Hobart any access whatsoever. The Commission argued that Hobart's presence in the Department building is itself illegal because Hobart would potentially be exposed to protected information. *See* N.T., 9/25/17, at 8 (arguing that Hobart could not "even be in the office or department because he constantly is surrounded by this information that he doesn't have access to."). This seemingly alludes to some form of recklessness such that a conscious disregard of the risk Hobart would see protected information is illegal. Those isolated references notwithstanding, the primary argument is that all officers need access to JNET material to work as a police officer.

In response, the FOP denied the Commission's contention that it would be virtually impossible for Hobart to regain JNET access: "To the contrary, the [Commission] simply needs to request that JNET reinstate his privileges. The [Commission] has refused, and continues to refuse, to seek reinstatement of Hobart's JNET privileges." FOP Answer, 7/14/17, at 5, ¶ 25. Regarding Chief Horner's email to JNET forwarding Horner's appeal, the FOP characterized it as a mere ministerial act. "In the absence of support from the Commission for the reinstatement of those privileges, the Respondent believes JNET will not reinstate those privileges." *Id.* at 6, ¶ 35.

The trial court scheduled a hearing and was initially inclined to simply take argument, asking, "[W]hy would it be illegal to put an officer back to work when that's what the arbitration award indicated? How is that breaking the law? . . . . Why would I vacate it?" N.T., 9/25/17, at 6-7. The Commission reiterated its position that "[Hobart] going back to work is going to cause the department and the officers to be in violation of Federal and the State laws." The court postponed the matter and invited the parties to submit briefs in advance of the evidentiary hearing.

In its brief, the FOP argued that the award was not illegal because the Municipal Police Officers' Education and Training Commission ("MPOETC"), 37 Pa. Code § 203.1 et. seq., sets forth the sole requirements for employment in municipal police departments like the Department. The "qualifications" section, which sets forth the requirements for "persons who are to be employed as police officers by police departments within this Commonwealth," 37 Pa. Code § 203.11, does not list access to JNET as a requirement. Upon receipt of MPOETC certification, an officer is authorized to enforce violations of the Crimes Code, Vehicle Code infractions, and carry a firearm. 37 Pa. Code § 203.13(b)(2).

Hobart, who has a MPOETC certificate, was thus authorized to enforce the law under the MPOETC, the exclusive statutory basis conferring police powers.

The Commission's brief reiterated its position that for all practical purposes a police officer needs JNET to do police work. The award therefore "necessarily requires the Commission to violate laws relating [to] unauthorized access to protected information." Commission's Memorandum of Law, 10/5/17, at 13. Responding to the claim that Hobart could work as an officer by virtue of his MPOETC certificate, the Commission cited equitable considerations. The Department is "a small police force of 13 officers covering a territory of approximately 27 square miles, [and] does not maintain any such specialized 'desk duty' positions." Employing Hobart as a desk officer would place "an undue burden on the other members of the bargaining unit," and would require "paying Hobart as an officer for performing clerical, rather than police work." *Id.* at 9.

An evidentiary hearing took place on October 26, 2017. The parties incorporated into the record the transcript of the deposition of Eric Webb, Executive Director of JNET, as taken by the FOP. The FOP asked Webb to explain the appeal procedure under JNET's policies. Webb explained that the individual agency sponsor, in this case Officer Wood, can decide to suspend a user. "So if there is a misuse within an agency and it is addressed through some sort of discipline, the end user cannot appeal to JNET directly because of our delegated administration. . . . The department makes the determination who the individuals [with access] are." N.T., 10/26/17, at 245. But where JNET administration itself imposes the discipline, the agency sponsor can appeal on behalf of the user but has no say in what JNET ultimately decides. "The sponsor would not have the authority to override the suspension. ... The sponsor cannot override our sanction."

*Id.* at 247. Further testimony established that Hobart requested an appeal, which was sent to JNET by Chief Horner. Webb did not perceive this to be a formal request for an appeal, *id.* at 263, and when asked by the Commission whether there was any possibility of overturning Hobart's ban, Webb replied, "I don't see any possibility of that." *Id.* at 266. Webb confirmed that the arbitrator's award does not constitute sufficient reason under JNET regulations to restore access and agreed that unless there was an error in the investigation "it would be futile to file some further appeal." *Id.* at 267.

Webb's testimony further established that JNET provides access to the PSP's Commonwealth Law Enforcement Assistance Network ("CLEAN"). Corporal Joseph R. McCunney of the PSP explained that the Federal Bureau of Investigation ("FBI") appoints an agency in every state to act as the key holder, basically, for protected information. The Pennsylvania State Police have been designated as that key holder by the FBI. N.T., 10/26/17, at 128. Corporal McCunney indicated that the FBI access gives CLEAN access to extensive information: "Federally protected information . . . arrest records; warrant information; vehicle information from other states throughout the country, throughout the world basically, federally-protected information that is law enforcement sensitive." *Id.* at 129. CLEAN guidelines are implemented by the PSP based on FBI guidelines. *Id.* at 139. The FBI regularly audits state agencies for compliance and if its guidelines are not followed, the FBI will revoke access.

Officer Wood testified that the policies of the individual agencies prohibit Hobart from learning the information through a third party, *id.* at 56, meaning that the Commission could not circumvent Hobart's termination by simply having another officer run searches on his behalf. The focus then turned to whether Hobart could perform various police

tasks, such as enforcing vehicle code violations, directing traffic, conducting interviews, and executing warrants, without access to JNET. Officer Wood testified that Hobart could arrest an individual, but without instant JNET access he could not determine whether the individual had active warrants. *Id.* at 55. Officer Wood further indicated that Hobart could interview witnesses, but he could not run background checks as part of his effort to determine whether the witness is credible. *Id.* at 53. Moreover, according to Officer Wood, while Hobart could stop a vehicle and issue tickets by mail, without JNET access he could not run the operator's information for warrants, nor could he determine if the vehicle was stolen. *Id.* at 52.

In his testimony, Chief Horner agreed that MPOETC certification "is all that is needed in order for an officer to perform his or her duties as a police officer," *Id.* at 98, but within the Department officers "have to have [JNET] access . . . . If any of the officers would not have [JNET], they would not be working for our police department." *Id.*

The trial court issued an order and opinion in support. The trial court accepted that putting Hobart back to work would require either restoring his JNET access (which the Commission had no authority to do), or having another officer provide Hobart with JNET information (which, again, the Commission had no authority to do). As such, either alternative would result in the violation of the laws cited in the Commission's memorandum of law. Order, 11/16/17, at 8. The court characterized the FOP's argument that no laws would be violated if Hobart were simply permitted to perform work that did not require JNET access as "ridiculous" because the Commission employs only fourteen officers who work shifts in pairs. *Id.* at 9. If Hobart could not access JNET the Commission would "have to pay Mr. Hobart a police officer's salary for not performing his

work and another officer for doing his own job and completing Mr. Hobart's work. This scenario would be a farce. Both petitioner and its citizens would be inconvenienced and overtaxed." *Id.*

The court's Pa.R.A.P. 1925(a) Opinion elaborated on this rationale in response to the FOP's assertion that the court exceeded the scope of review by impermissibly relying on equitable factors:

> Respondent simply argues that this court should not have considered the equities. Even assuming arguendo that this court wrongfully considered the inequitable results of Mr. Hobart's employment as a nonfunctioning police officer, this court ultimately found that Mr. Hobart's employment would result in violations of law and regulations.

Trial Court Opinion, 1/19/18, at 3.

The FOP appealed and the Commonwealth Court reversed in a split decision. The Honorable P. Kevin Brobson, joined by the Honorable Anne E. Covey, accepted the premise that Hobart's employment within the Department required JNET access. Addressing the claim that MPOETC certification was all that is legally needed to perform the job of "police officer," the court observed that

> The award did not reinstate Hobart to a generalized police officer position. Rather, the award reinstated Hobart to a police officer position *within the Department*. According to the unrebutted testimony of Chief Horner and Sergeant Wood, the Department's structure and makeup demand that all of its police officers have access to JNET, CLEAN, and PennDOT's system, because officers for the Department use them on a near-daily basis.

*N. Berks Reg'l Police Comm'n v. Berks Cty. FOP, Lodge #71*, 196 A.3d 715, 723 (Pa. Commw. 2018). The court nevertheless vacated the trial court's order because Hobart

could theoretically regain JNET access through other channels,[6] including potential administrative remedies:

> Notwithstanding this conclusion, we will vacate the trial court's order. Although we find no fault with the trial court's determination that Hobart cannot currently return to the Department as a police officer, as the award provides, it is not at all clear to us that the award can never be implemented. What is currently before us is a dispute over implementation of an arbitrator's award, not the facial illegality of the award itself. The record created before the trial court reveals that Hobart *may* have available administrative remedies before the state agencies administering the systems in question to regain access and thus be able to fulfill the duties of a police officer within the Department.

*Id.*

The Commonwealth Court remanded the matter to the trial court with instructions to stay proceedings "until all avenues of relief were exhausted," at which time the trial court "may then consider the question of whether the Commission can implement the award without violating the law." *Id.* at 725.

The Honorable Dan Pellegrini, sitting as senior judge, dissented and faulted the majority's application of the narrow certiorari standard.

> Nothing in the arbitrator's award requires that the Commission give Hobart access to those portals, only that it continue to employ him as a police officer. Under the award, it is up to the Commission to fashion a position in which Hobart would not have access to that information. While not having access to those portals would limit his usefulness and cause expense and difficulty within the Commission, to fashion such an award does not require the Commission to perform an illegal act.

---

[6] The Commonwealth Court took judicial notice that Hobart had filed lawsuits in the Commonwealth Court's original jurisdiction against the governmental agency responsible for JNET, plus PSP and PennDOT, raising due process challenges to his access revocations. Those proceedings have been stayed pending disposition of this matter.

*Id.* at 735 (Pellegrini, J., dissenting).

Judge Pellegrini was, however, sympathetic to the trial court's result, writing that he "wish[es] I could affirm" the order. *Id.* at 727. The dissent recognized that to do so would require revamping the scope of review. Judge Pellegrini urged this Court to do so, opining that "[m]aking any attempt to divine the intent from Act 111 as to what standard of review should apply is unwarranted." *Id.* at 733. He urged this Court to adopt the standards set forth in the Uniform Arbitration Act ("UAA"). "Our Supreme Court has applied the narrow certiorari test rather than the essence test to police and firefighter grievance arbitrations, notwithstanding that the [UAA] provides for a judgment jnov/error of law standard for all arbitrations." *Id.* at 730. Under that standard, Judge Pellegrini concluded that "no reasonable person would agree with the arbitrator's outcome." *Id.* at 728. That assessment relied not only on a value judgment regarding the underlying conduct but on the subsequent JNET terminations. *Id.* at 727-28 (arguing that "no reasonable person could find that Hobart's conduct ... causing him to be permanently banned from access to the PennDOT, JNET and CLEAN portals necessary for an officer to perform his job, is not just cause for dismissal.").[7]

---

[7] We note that Judge Pellegrini's dissenting opinion stated that "The trial court found that Hobart sexually stalked a female coworker and that the award would force Hobart's victim to continue working with him." *N. Berks Reg'l Police Comm'n v. Berks Cty. FOP, Lodge #71,* 196 A.3d 715, 734 (Pa. Commw. 2018) (Pellegrini, J, dissenting). This statement was taken from the trial court's opinion. However, on appeal to the Commonwealth Court, the FOP challenged the trial court's factual findings, to which the majority wrote:

> [W]e also dispose of the FOP's third argument—that the trial court erred by basing its decision on an incorrect factual finding. Specifically, the FOP takes issue with the trial court finding that Hobart "sexually stalk[ed] victims, including a fellow officer," and that reinstating Hobart would compel the

We granted the Commission's appeal to consider the following issues:

> (1) Whether the Commonwealth Court erred in vacating and remanding the trial court's decision despite the fact there was no finding of error in the trial court's opinion and the Commonwealth Court relied upon hypothetical actions that could occur in the future, rather than on the record before it.
>
> (2) Whether the narrow certiorari scope of review used in Act 111 matters should encompass a public policy exception, as part of the review of whether an arbitrator exceeded his powers, or, in the alternative, whether the narrow certiorari scope of review set forth in *Pennsylvania State Police v. Pennsylvania State Troopers' Association (Betancourt)*, 540 Pa. 66, 656 A.2d 83 (1995) should be replaced by the essence test or JNOV/error of law test.

*N. Berks Reg'l Police Comm'n v. Berks Cty. FOP, Lodge #71*, 216 A.3d 229, 229-30 (Pa. 2019).

## II.     Judicial review under Act 111

Act 111 was enacted in the wake of *Erie Firefighters Local No. 293 v. Gardner*, 178 A.2d 691 (Pa. 1962) (per curiam), which held that its predecessor was not binding on municipalities on constitutional non-delegation grounds. *Id.* at 695 (citing Pa. Const. art. 3, § 20 (repealed)). That former law "prohibited strikes and attempted to provide for the

---

> Commission to force a victim to work with Hobart. (R.R. at 699a.) Although the parties agree that this finding is unsupported by record evidence, we determine that it played no significant part in the trial court's conclusion that reinstating Hobart would compel the Commission to commit an illegal act.

*Id.* at 726. As the parties agreed that this finding was unsupported, and the Commission has not made any factual representations along these lines in its brief to this Court, we likewise disregard it.

Relatedly, while Hobart masturbated to photographs in the Department's bathroom, the arbitrator's opinion simply referred to photographs in general. It is therefore unclear whether the arbitrator intended to refer to the pornographic pictures Hobart downloaded from the internet or the photographs obtained from JNET.

adjustment of grievances through negotiations" but did not allow for collective bargaining. *Moon Twp. v. Police Officers of Moon Twp.*, 498 A.2d 1305, 1308 (Pa. 1985). "This double denial of rights to police and fire personnel fueled the growing tension between labor and management, tension which culminated in 'illegal strikes and a general breakdown in communication between public employers and their employees.'" *PSP v. PSTA*, 741 A.2d 1248, 1251 (Pa. 1999) (*Smith*) (quoting *Betancourt*, 656 A.2d at 89). Following *Erie Firefighters*, the electorate authorized an amendment to the Pennsylvania Constitution, Pa. Const. art. 3, § 31, which allowed "the adjustment or settlement of grievances or disputes or for collective bargaining between policemen and firemen and their public employers." That amendment cleared the way for new legislation.

Act 111 was passed two years later. It continued to withhold the right to strike from police and firefighters but conferred "the right to bargain collectively with their public employers concerning the terms and conditions of their employment[.]" 43 P.S. § 217.1. This process, deemed interest arbitration, is "in essence, the process by which the parties, through a neutral arbitrator or panel, create a collective bargaining agreement." *Michael G. Lutz Lodge No. 5, of FOP v. City of Philadelphia*, 129 A.3d 1221, 1226 (Pa. 2015). Interest arbitration is distinct from grievance arbitration, which involves disputes over how the governing bargaining agreement should be interpreted and/or applied. The instant case is in the nature of grievance arbitration, as it involves whether the employer had just cause for terminating Hobart's employment under the bargaining agreement.

Grievance arbitration is not specifically mentioned in Act 111 as its language speaks only to the resolution of disputes arising from "the collective bargaining process," i.e. interest arbitration, which must be settled before a board of arbitration composed of

three persons. 43 P.S. § 217.4(b). However, Section 1 of Act 111 states that police and firefighters "shall have the right to an adjustment or settlement of their grievances or disputes in accordance with the terms of this act," 43 P.S. § 217.1, and in *Chirico v. Bd. of Sup'rs for Newton Twp.*, 470 A.2d 470, 474–75 (Pa. 1983), we held that the General Assembly intended for Act 111 and the concomitant body of case law regarding the appellate scope of review to apply to grievance disputes. Therefore, an arbitrator's decision in an Act 111 case, whether grievance or interest, "shall be final on the issue or issues in dispute and shall be binding upon the public employer . . . . No appeal therefrom shall be allowed to any court." 43 P.S. § 217.7(a).[8]

Despite Act 111's preclusion of appeals, we adopted the narrow certiorari mechanism for a combination of pragmatic, historical, and constitutional reasons. In particular, this Court announced the adoption of the narrow certiorari standard in *Washington Arbitration,* 259 A.2d 437, 439 (Pa. 1969)*,* to address due process and other

---

[8] The statute reads:

> (a) The determination of the majority of the board of arbitration thus established shall be final on the issue or issues in dispute and shall be binding upon the public employer and the policemen or firemen involved. Such determination shall be in writing and a copy thereof shall be forwarded to both parties to the dispute. **No appeal therefrom shall be allowed to any court.** Such determination shall constitute a mandate to the head of the political subdivision which is the employer, or to the appropriate officer of the Commonwealth if the Commonwealth is the employer, with respect to matters which can be remedied by administrative action, and to the lawmaking body of such political subdivision or of the Commonwealth with respect to matters which require legislative action, to take the action necessary to carry out the determination of the board of arbitration.

43 P.S. § 217.7 (emphasis added).

constitutional concerns. The city of Washington challenged an interest arbitration award by filing suit in the court of common pleas, claiming that it required an illegal act. The city argued that its appeal was permitted under Article V, Section 9 of the Pennsylvania Constitution, which provides in relevant part that "[t]here shall be a right of appeal in all cases to a court of record from a court not of record." We rejected this challenge: "This provision is inapplicable to the case at hand. An arbitration panel is neither a court nor an administrative agency. The inherent differences between an arbitration panel on the one hand, and courts and administrative agencies on the other, well explain the logic behind the distinction." *Id.* at 440 (footnotes omitted). *Washington* thus concluded "that the city did not have the right to appeal," *id.*, with the trial court lacking jurisdiction to address the claim.

This Court recognized, however, that arbitrators could not be totally insulated from oversight. *Id.* at 441 n.5 ("No one would argue, for instance, that a public employer could set up different wage scales for its black and its white employees just because the arbitrator so ordered."). To guard "the city's rights under the United States and Pennsylvania Constitutions, and specifically its right to due process," *id.* at 440, we invoked then-existing Supreme Court Rule 68½[9] as "a perfectly adequate mechanism for

---

[9] Rule 68½ was applied in circumstances where there was no right of appeal. Rule 68½ was promulgated in 1964 and stated:

> Where the subject matter does not fall within the statutory jurisdiction of the Superior Court, an appeal to the Supreme Court in the nature of a certiorari from a judgment order or decree will lie only if specially allowed by the Court or by a Judge thereof, where a statute expressly provides that there shall be no appeal from the decision or order or judgment or decree of a Court, or that the decision or order or judgment or

the protection of constitutional rights." *Id.* In *Washington,* we set forth the four prongs of the narrow certiorari scope of review:

> We have decided to grant the city's petition under Rule 68 1/2. The parameters of the review permissible under that rule are as follows:
>
>> 'If an appeal is prohibited by an Act, or the decision of the Agency is stated to be final or conclusive, the law is well settled that an appeal will lie to the Courts in the nature of a narrow certiorari and this Court will review only (1) the question of jurisdiction; (2) the regularity of the proceedings before the Agency; (3) questions of excess in exercise of powers; and (4) constitutional questions. Cf. *Devito v. Civil Service Commission*, 404 Pa. 354, 172 A.2d 161 (and cases cited therein); *Dauphin Deposit Trust Company v. Myers*, 401 Pa. 230, 164 A.2d 86.'

*Id.* at 441 (quoting *Keystone Raceway Corp. v. State Harness Racing Comm'n*., 173 A.2d 97, 99 (Pa. 1961)).

Rule 68½ no longer exists but we have carried forward the narrow certiorari standard articulated in *Washington*. *Moon Twp*, 498 A.2d at 1307 n.4 ("Although Rule 68 ½ has since been repealed, we will retain the stated scope of review.").

**III.     Whether the Commonwealth Court Erred in Vacating and Remanding the Trial Court's Decision Despite the Fact There Was no Finding of Error in the Trial Court's Opinion and the Commonwealth Court Relied**

---

decree of a Court shall be final or conclusive, or shall not be subject to review, or where the relevant statute is silent on the question of appellate review.

*City of Philadelphia v. Chase & Walker Corp.*, 240 A.2d 65, 66–67 (Pa. 1968) (quoting Rule). As quoted, *Washington* elected to treat the appeal as a petition for allowance of appeal.

**Upon Hypothetical Actions That Could Occur in the Future, Rather Than on the Record Before It**

**A. The Arguments of the Parties**

The Commission first argues that the trial court correctly applied the narrow certiorari scope of review by finding that the arbitrator exceeded his powers in ordering it to commit an illegal act. In turn, "the Commonwealth Court erroneously exceeded its scope of review and relied upon certain portions of deposition testimony that it believes supports the conclusion that JNET had not yet received an appeal of its decision to bar Mr. Hobart permanently from access to JNET." Commission's Brief at 15. It further faults the Commonwealth Court for taking notice of Hobart's due process challenges in ongoing proceedings because those facts were "not offered into evidence at the fact-finding level." *Id.* at 16. The Commission characterizes the panel as deciding the case based on hypothetical facts, rendering its opinion advisory. In any case, the Commission points to the testimony of Mr. Webb, who testified that there was virtually no possibility of overturning the JNET suspension. Finally, to the extent that the Commonwealth Court could actually order the Commission to take affirmative action by asking JNET to consider and process Hobart's appeal, a proposition with which it strenuously disagrees, the Commission states that the trial court had already rendered conclusive determinations on those points as a matter of credibility and fact-finding. *See* N.T., 10/26/17, at 90 (testimony of Chief Horner, "I sent over Hobart's appeal letter to JNET, PennDOT, and CLEAN for them to process"). The Commission states that the Commonwealth Court's independent examination of the testimony "replaces the trial court as fact-finder" and constitutes "an impermissible broadening of the scope of review." Commission's Brief at

20. *See also id.* at 26 n.4 (arguing that "the arbitration award should be vacated even under the current narrow certiorari scope of review").

Conversely, the FOP argues that the Commonwealth Court's majority did not find error in the trial court's order. In sharp contrast to the Commission's view, the FOP argues that the panel majority found that the Commission was not required to commit any illegal act, as evidenced by its characterization of the legal issue as "a dispute over the implementation of an arbitrator's award, not the facial illegality of the award itself." FOP's Brief at 43 (quoting *Northern Berks*, 196 A.3d at 723). In its view, "all three judges agreed the issue before the court did not involve an illegal arbitration order." *Id.*

The FOP submits that the courts below went further than the narrow certiorari standard permits. "A fair treatment of this case requires a fair treatment of the entirety of the issues in dispute before the arbitrator." *Id.* at 15. The FOP emphasizes that the issue decided by the arbitrator was limited to whether "the Commission had just cause to discharge Officer Hobart[.]" *Id.* at 16 (quoting arbitrator's opinion). The FOP characterizes that discrete issue as one involving fact-finding regarding the comparative discipline imposed against Officer DeBlasi, which binds reviewing courts even if the court disagrees with those findings. *Id.* at 18-19. The FOP also notes that the arbitrator considered Hobart's reputation within the Department and determined that fellow officers, while disheartened by his conduct, would not have been impacted by his employment. *Id.* at 23.

## B. Analysis

The Commission contends that the Commonwealth Court erred in vacating the trial court's order. "The Commission maintains that the trial court property vacated the

arbitrator's award under the narrow certiorari standard of review applicable to Act 111 matters, as the award "causes the Commission to take an unlawful action or do something it cannot voluntarily do." Reply Brief at 1. We disagree.

In determining whether an arbitrator requires the employer to commit an illegal act, this Court has consistently focused on whether the award forces the employer to do an act "not within the authority of the employer or that was prohibited by law." *Appeal of Upper Providence Police Delaware Cty. Lodge No. 27 FOP*, 526 A.2d 315, 321 (Pa. 1987). As we stressed in *Washington*, "an arbitration award may only require a public employer to do **that which it could do voluntarily**". *Washington*, 259 A.2d at 442 (emphasis added). As such, if an employer may take the ordered action lawfully, then the arbitrator has not exceeded his or her powers under the "excess of powers" prong of the narrow certiorari standard and the arbitration award may not be overturned on that basis.

As a result, the question in each instance is whether an employer has the **discretion** to undertake the ordered act in accordance with existing law. In *Chirico*, 470 A.2d 470 (Pa. 1983), for example, we held that an arbitration award was properly overturned where it required the provision of pension disability payments for non-service related disabilities, where the governing statute explicitly limited disability pensions to service-related disabilities. 470 A.2d at 472. Similarly, in *Conley v. Joyce*, 393 A.2d 654 (Pa. 1978), we approved of the modification of an award to the extent that it required a city to compensate police officers for overtime in circumstances where it was prohibited from doing so by statute. *Id.* at 657. In these instances, the employer lacked any discretion under the law to undertake the actions required by the arbitration award.

In the present circumstances, in significant contrast, no statutory or other restriction prohibits the Commission from reinstating Hobart as a police officer despite his lack of access to JNET. If Hobart were to apply for a job today, the Commission would have the discretion to hire him even though he cannot access JNET databases. MPOETC regulations supply the exclusive statutory requirements for employment as a police officer and Hobart is MPOETC certified. Given the Department's small territory, two-man shifts and dearth of administrative "desk duty" work, it may well be a terrible, if not farcical, exercise of discretion, but it would nevertheless be an act of discretion. The record here well-documents the importance of JNET access to a police officer's ability to perform all of the functions typically expected of police officers in the Department. But Hobart's employment as a police officer by the Department does not violate state law, and in fact given MPOETC's exclusive statutory requirements, Hobart's employment as a police officer is expressly permitted under Pennsylvania law. Perhaps MPOETC should be amended to require JNET access as a condition of enforcing the laws of our Commonwealth, but that is a matter for the General Assembly's consideration rather than that of this Court.[10]

The trial court and Commonwealth Court erred in their analyses of the "excess of powers" prong of narrow certiorari by improperly considering whether the Commission had the discretion to employ Hobart based not only in accordance with Pennsylvania law

---

[10] In *Smith*, wherein this Court rejected the PSP's attempt to expand *Betancourt* to include a public policy exception, we observed that municipal officers are disqualified from MPOETC certification once convicted of a felony or serious misdemeanor. *Smith*, 741 A.2d at 1252 n.6. We indicated that "[t]he decision to add such a similar provision applicable to members of the State Police is one for the legislature, and not this Court, to make." *Id.*

but also upon Departmental practices. While agreeing that MPOETC certification "is all that is needed in order for an officer to perform his or her duties as a police officer," Chief Horner testified that officers within the Department "have to have [JNET] access ... If any of the officers would not have [JNET], they would not be working for our police department." *Id.* at 98. Again, the question here is whether the Commission **may** legally hire Hobart as a police officer, not whether it **would** do so. In *Washington*, this Court emphasized that in assessing whether the public employer could voluntarily undertake an action ordered by an arbitrator, said public employer may not "hide behind self-imposed legal restrictions." *Washington*, 259 A.2d at 442. As a result, while departmental policies may well play an important role in the exercise of discretion as to whether to undertake various actions (like whether to hire Hobart), they play no role in the determination as to whether it would be illegal to do so. That the Commission would not hire Hobart under its own self-imposed constraints, regardless of how logical those restrictions might be, is irrelevant to its ability to do so lawfully.

Our extensive review of the certified record reflects that both the trial court and the Commonwealth Court failed to limit themselves to the issue actually decided by the arbitrator. As the FOP correctly indicated, "[n]one of the lower court opinions gave any weight to what was a critical issue to the arbitrator's decision, i.e. comparative discipline" and the Commission's own policy of requiring that discipline in prior similar cases be a factor in meting out current discipline. FOP's Brief at 22-23. At the outset of the arbitration, the arbitrator framed the issue presented by the FOP as "whether the Commission had just cause to discharge [Hobart] and, if not, what shall be the remedy?" Arbitrator's Opinion, 5/30/17, at 4. The Commission relied on Hobart's "misuse of JNET

and the resulting abuse of the public trust extended to every sworn officer who utilizes these police informational services." *Id.* at 5. The FOP, while not contesting that discipline was appropriate, stated that the Commission "did not apply its rules, orders and penalties evenhandedly and without discrimination," and that termination was "disproportional when compared to the discipline issued to Officer DeBlasi," who had committed thousands of JNET violations yet had received only a four-day suspension. *Id.* at 6. The arbitrator clearly agreed with the FOP and indicated in the award that "the punishment assessed to [Hobart] is glaringly disproportionate to the offense." *Id.* at 14. The arbitrator found that Hobart's conduct warranted serious discipline in consideration of the nature of some of the pornographic material downloaded from the internet using department equipment and the use of JNET to search and then print photographs of women. He issued an award that granted reinstatement with the time off converted into a disciplinary suspension without pay. *Id.* at 15. Nevertheless, the arbitrator's decision to reinstate Hobart was strictly limited to the issue presented in the FOP's grievance, namely the allegation of disproportionality between the Commission's termination of Hobart and its short suspension of DeBlasi for more extensive JNET violations.

We cannot agree with the Commission's contention that the arbitrator ordered Hobart back to work "despite the fact that he was barred from using [JNET]." Commission's Brief at 34 n.5 (emphasis added). The arbitrator instead limited his decision to an analysis as to whether the Commission had just cause to terminate Hobart at the time of his termination on September 27, 2016. While the trial court correctly notes that Hobart's loss of JNET access privileges was known by the time of the arbitration (on March 22, 2017), for purposes of the issue before the arbitrator, it was irrelevant to

whether he was fired for just cause on September 27, 2016 or what was the appropriate remedy for said termination without just cause.

We take no issue with the arbitrator's decision to limit his inquiry to the issue presented in the grievance and the facts known to the Commission at the moment it decided to discharge Hobart. In so doing, the arbitrator did not in any respect exceed his powers so as to create a basis for the vacation of the award under the narrow certiorari standard of review. Quite to the contrary, the arbitrator's exacting focus on the issues presented in the FOP's grievance petition was entirely proper and clearly in accordance with the limits of his powers as an arbitrator. This Court has held that an arbitrator's ruling on an issue not before it constitutes an excess of his or her powers. In *Dep't of Corr. v. Pennsylvania State Corr. Officers Ass'n*, 12 A.3d 346, 356 (Pa. 2011), for example, we ruled that "[a]n award pertaining to an issue that was not placed in dispute before the board also reflects an excess of the arbitrators' powers." *Id.* at 356 n.15. Similarly, in *Michael G. Lutz Lodge No. 5*, 129 A.3d at 1222, this Court held that the authority of arbitrators "is limited to addressing issues properly submitted to the panel, or those questions reasonably subsumed within those issues." In this case, the issue submitted for arbitration was whether the Commission had just cause to terminate Hobart's employment given the alleged lack of disproportionality of the lesser discipline issued to Officer DeBlasi. The arbitrator properly limited his scope to this issue.

In this regard, the arbitrator's actions were in keeping with a decision of the United States Supreme Court in a case involving analogous facts, *United Paperworkers Int'l Union v. Misco, Inc.*, 484 U.S. 29 (1987). In that case, Isiah Cooper's job with Misco entailed operating a machine that used sharp blades to cut rolling coils of paper. *Id.* at

32. The arbitrator found that the machine was hazardous and caused numerous injuries, and Cooper had previously received two safety reprimands.

Because of the danger posed by such machinery, company policy permitted discharge for bringing controlled substances on plant property, consuming them on site, and/or for operating machinery while under the influence of controlled substances. *Id.* An officer happened to be surveilling Cooper, as his home was the target of a search warrant that evening. The officer observed Cooper enter, with two other men, an Oldsmobile Cutlass vehicle, which was not Cooper's vehicle. Cooper remained in the vehicle after the others returned to the plant. *Id.* The officer apprehended Cooper in the backseat, observing marijuana smoke and a marijuana cigarette in the front ashtray. Police searched the Cutlass and found additional marijuana. *Id.* The police also searched Cooper's own vehicle, which was on company premises, and discovered marijuana gleanings.

Meanwhile, the search of Cooper's residence ultimately recovered a substantial amount of marijuana. *Id.* at 33. Cooper informed Misco of his arrest for having marijuana at home. During its investigation, the company later independently learned of the marijuana cigarette in the Cutlass. Misco terminated Cooper, asserting that "his presence in the Cutlass violated the rule against having drugs on the plant premises." *Id.* The matter proceeded to arbitration, where the issue presented was "whether the Company had 'just cause to discharge [Cooper]' and, '[i]f not, what if any should be the remedy.'" *Id.* at 33-34 (citation omitted).

Relevant for present purposes, five days before the arbitration hearing, Misco learned that marijuana was found in Cooper's own vehicle. The arbitrator refused to

consider that fact and ordered Misco to reinstate Cooper, finding that Misco had failed to prove that Cooper possessed marijuana on company property. At the arbitration, Misco proved only that Cooper was present in the Cutlass with marijuana; it did not also prove that the marijuana belonged to Cooper. With respect to the evidence that Cooper's vehicle contained marijuana, thereby definitively establishing Cooper possessed marijuana on company grounds in violation of company policy, the arbitrator "refused to accept into evidence th[at] fact ... because the Company did not know of this fact when Cooper was discharged and therefore did not rely on it as a basis for the discharge." *Id.* at 34 (emphasis added). For this reason, the arbitrator reinstated Cooper's employment.

Misco filed suit in the federal district court, arguing that reinstating Cooper for possessing marijuana on plant premises was contrary to public policy. The district court agreed and vacated the award, which was affirmed on appeal. *Misco, Inc. v. United Paperworkers Int'l Union*, 768 F.2d 739 (5th Cir. 1985). The court of appeals criticized the arbitrator for ignoring what "the arbitrator knew was in fact true: that Cooper did bring marijuana onto his employer's premises." *Id.* at 743.

The Supreme Court reversed for three reasons. The first reason, and the one relevant point for present purposes, was that the arbitrator was free to confine the decision of whether just cause existed to the facts known to the employer at the time of the termination:

> Here the arbitrator ruled that in determining whether Cooper had violated Rule II.1, he should not consider evidence not relied on by the employer in ordering the discharge, particularly in a case like this where there was no notice to the employee or the Union prior to the hearing that the Company would attempt to rely on after-discovered evidence. This, in effect, was a construction of what the contract required when deciding discharge cases: **an arbitrator was to look only at**

**the evidence before the employer at the time of discharge**.

*Misco*, 484 U.S. at 39–40 (emphasis added). In so ruling, the Supreme Court emphasized that the employer was not without recourse: "Finally, it is worth noting that putting aside the evidence about the marijuana found in Cooper's car during this arbitration did not forever foreclose the Company from using that evidence as the basis for a discharge." *Id.* at 40–41.

As in *Misco*, the Commission here was not without recourse in light of the arbitrator's award. Specifically, the Commission could have complied with the award by reinstating Hobart's employment and then terminating his employment based upon his lack of JNET access and resulting inability to perform the functions demanded of a police officer in the Department. His loss of JNET access by the issuing authority occurred after his original termination, was not a reason for that termination, and had not been considered by the arbitrator in his decision to reinstate Hobart. Once Hobart had been reinstated, the loss of JNET access could have served as a new and independent basis for the Commission to terminate his employment.

Rather than availing itself of this readily available recourse, the Commission instead decided to superimpose post-termination circumstances into the proceedings in an effort to create an illegality. The Commission's petition to vacate the arbitrator's award filed with the trial court was based entirely upon factual developments post-dating Hobart's termination, namely his loss of JNET access and the alleged illegally of employing him without it. Because the arbitrator limited his inquiry to the issue actually presented in the FOP's grievance petition and fashioned an award strictly in accordance with his factual finding of disproportionality, he did not expand or exceed the scope of his

powers and the award should not have been vacated under the narrow certiorari standard of review on that basis.

While the *Pennsylvania State Corr. Officers Ass'n, Michael G. Lutz Lodge No. 5* and *Misco* cases all speak to the limitations on the scope of proceedings before an arbitrator, it follows a fortiori that any reviewing court is likewise limited to consideration of the issues actually presented to, and decided by, the arbitrator. It would be nonsensical to suggest that an arbitrator is required to limit his or her decision to the issues submitted by the parties, but then permit a reviewing court to vacate the award based upon facts and issues that were not decided by the arbitrator.

We therefore conclude that the trial court erred in vacating the award of the arbitrator. While the Commonwealth Court reversed the decision of the trial court, it did so only pending upon the results of Hobart's attempts to regain his access to JNET. The Commonwealth Court should have reversed the decision of the trial court and reinstated the arbitrator's award.

**IV.     Whether the Narrow Certiorari Scope of Review Used in Act 111 Matters Should Encompass a Public Policy Exception, as Part of the Review of Whether an Arbitrator Exceeded His Powers, or, in the Alternative, Whether the Narrow Certiorari Scope of Review Set Forth in *Pennsylvania State Police v. Pennsylvania State Troopers' Association (Betancourt)*, 656 A.2d 83 (1995) Should Be Replaced by the Essence Test or JNOV/error of Law Test**

The Commission requests that this Court generally modify Act 111's scope of review to include either a public policy exception to the "excess of powers" prong of the narrow certiorari standard of review or, alternatively, to replace the narrow certiorari standard of review with either the essence test (currently applied in the PERA context) or a JNOV/error test. The FOP argues that the Commission raises this issue for the first

time in this Court and thus has failed to preserve the issue for review by this Court.[11]  FOP Brief at 6 (citing Pa.R.A.P. 302(a)).  Accordingly, the FOP contends that the issue has been waived.

The Commission forthrightly admits that it did not raise this issue before either the trial court or the Commonwealth Court.  Commission's Reply Brief at 1.  Instead, the Commission raises three arguments in opposition to the application of Rule 302(a).  None is convincing.  First, the Commission posits that asking the trial court to expand the narrow certiorari standard of review would have been futile, as that court was obviously bound by this Court's decision in *Betancourt. Id.*  This Court has not, however, ever adopted a futility doctrine that would relieve litigants of the requirement to advance objections and challenges at the earliest opportunity to do so.  *See Commonwealth v. Hays*, 218 A.3d 1260, 1268 (Pa. 2019) (Saylor, C.J., concurring) (citing *Schmidt v. Boardman Co.*, 11 A.3d 924, 941 (Pa. 2011)).

Second, the Commission argues that in the Commonwealth Court, it was the FOP that filed the appeal, and thus it had no obligation (or opportunity) to raise issues before that tribunal.  Commission's Reply Brief at 1-2.  The Commission insists that the standard of review issue arose at that level of the proceedings, when it was discussed in the dissenting opinion of Judge Pellegrini.  *N. Berks*, 196 A.3d at 729-34 (Pellegrini, J.,

---

[11]  The FOP raises the issue of waiver for the first time in its brief filed with this Court.  It did not do so in its Answer to Petition for Allocatur, instead addressing only the merits of the issue.  Answer to Petition for Allocatur, 12/13/2018, at 9-15.  In connection with this author's concurring opinion in *Commonwealth v. Bishop*, 217 A.3d 833, 844 (Pa. 2019) (Donohue, J., concurring), the Court has requested that our appellate rules committee consider a new rule of appellate procedure addressing the consequences of a respondent's failure to raise the issue of waiver at the allocatur petition stage.  As no such rule has been promulgated to date, however, we will proceed to consider the FOP's waiver argument on its merits.

dissenting). Because the issue had already been waived as a result of the Commission's failure to raise it at the trial court level, however, events in the Commonwealth Court do not alter the conclusion that the Commission waived the issue.

Finally, the Commission argues that there is an exception to the waiver rule for cases involving questions of jurisdiction or public policy, citing to *Haagen v. Patton*, 164 A.2d 33 (Pa. Super. 1960). The Superior Court's decision in *Haagen* was never adopted or otherwise cited with approval by this Court, however, and it would appear that it was only applied with respect to the public policy of the appropriation of public funds. *See, e.g.*, *Murphy v. Bradley*, 537 A.2d 917, 919 (Pa. Commw. 1988). More importantly, to the extent that *Haagen* created a general "public policy" exception to issue preservation requirements, it was effectively overruled by subsequent decisions of this Court. In *Reilly by Reilly v. SEPTA*, 489 A.2d 1291 (Pa. 1985), this Court held that "[t]he failure to preserve an issue on appeal will be excused only when a strong, public interest outweighs the need to protect the judicial system from improperly preserved issues." *Id.* at 1301. With respect to what constitutes a "strong, public interest," we cited to *Commonwealth v. McKenna*, 383 A.2d 174 (Pa. 1978), in which an unpreserved appeal was allowed to proceed to ensure that capital punishment in Pennsylvania comported with the United States Constitution. *Id.* at 181. We subsequently confirmed the extremely limited nature of the "public interest" exception (specifically, to capital criminal appeals) in *McMillen v. 84 Lumber, Inc.*, 649 A.2d 932 (Pa. 1994), where we indicated that "[a]side from capital cases in the domain of criminal law – where a human life is at stake, no fact situations have been presented to us, and none readily comes to mind, where this narrow public interest exception would justify departure from the waiver rule." *Id.* at 934.

Because the Commission did not raise the issue of modification of the narrow certiorari standard of review in Act 111 matters in the lower courts, application of basic issue preservation principles require that we find that this issue is waived. Pa.R.A.P. 302(a) (providing that "[i]ssues not raised in the lower court are waived and cannot be raised for the first time on appeal"); *see e.g., Valentino v. Philadelphia Triathlon, LLC*, 209 A.3d 941, 942 (Pa. 2019) (holding that issues not raised in the lower tribunals are waived).

## V. Conclusion

We reverse the decision of the Commonwealth Court and remand the case to that court with instructions to reinstate the arbitrator's award.

Chief Justice Saylor and Justices Baer, Todd, Dougherty, Wecht and Mundy join the opinion.